HARRY T. GEISENDAFFER *v.* MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.

[No. 38, January Term, 1939.]

*Decided February 1st, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, and DELAPLAINE, JJ.

*Randolph Barton, Jr.,* and *Albert F. Wheltle,* for the appellant.

*Charles C. G. Evans, City Solicitor,* with whom was *Allen A. Davis, Assistant City Solicitor* on the brief, for the appellees.

BOND, C. J., delivered the opinion of the Court.

A taxpayer's bill in equity questions the validity of an issue of certificates of indebtedness by Baltimore City without the regular submission to popular vote of an

ordinance for contracting a debt. The City contends that there was an emergency that dispensed with the submission. The chancellor held the issue valid, denied an injunction prayer, and dismissed the bill of complaint. The complainant appeals.

The provision in the Constitution of the State, article 11, section 7, prohibiting the creation of a municipal debt without the submission, makes the exceptions that "the Mayor and City Council may, temporarily, borrow any amount of money to meet any deficiency in the City Treasury, and may borrow any amount at any time to provide for any emergency arising from the necessity of maintaining the police, or preserving the health, safety and sanitary condition of the city." And an ordinance declaring, in its title, its preamble, and its first section, the existence of an emergency so arising from the need of making provision for the relief of the destitute unemployed and unemployable in the city during the present economic depression, directed the issue of $4,025,000 of certificates, payable in five successive instalments beginning on December 1st, 1941. The purpose was that all the proceeds of the borrowing on the certificates, except so much as was needed for relief in the months of November and December, 1938, after passage of the ordinance, should be applied to replacement of money received from taxes during 1936, 1937, and 1938, and required by the City Charter to be expended on ordinary municipal functions, but which, because of failure of an assurance of funds for the purpose from the State, was spent by the City in the relief of the destitute, and not reimbursed.

It is this replacement of funds so spent in the past which is the subject of controversy. Does the need of making it present an emergency within the meaning of the constitutional clause? Or, more accurately, could it be regarded as presenting such an emergency? "Whether an emergency exists is a question of fact. Primarily a legislative finding is sufficient but, except where the power to determine the question is specifically granted * * * by no means conclusive proof that an emergency

exists. * * * Such a finding is, however, always entitled to great weight and will not be set aside or annulled unless it clearly and unmistakably appears that it is erroneous. * * * Delegates representing in its legislative body the City of Baltimore have united in the finding of such an emergency, and the conclusion resulting from their independent deliberations should not be set aside except upon convincing evidence that their findings are erroneous." *Norris v. Baltimore,* 172 Md. 667, 693, 695, 192 A. 531, 543.

There is no dispute of what occurred. As is well known, the need for relief of the destitute had called for outlays of public money at an earlier date during the depression. Private charities had become incapable of meeting it, and since 1932 Baltimore City had been meeting it by disbursing from week to week funds made up by means of temporary loans. A bond issue of $12,000,000 under an Act of 1933, chapter 254, had secured repayment of those loans. On September 1st, 1933, the federal and state governments took over the burden and administered relief through local agencies, the agency in Baltimore having been the Baltimore Emergency Relief Commission. In March of 1936, however, the federal government abandoned the plan of distributing funds for relief directly, and turned to that of providing work and wages for the unemployed, together with assistance in the payment of old age pensions by the states. From its gross receipts tax (Act of 1935, ch. 188), the State of Maryland had funds for relief during the months of January, February and March, 1936, but by March, the same month in which the federal government changed its plans, these funds were exhausted, and the state officials were unable to continue the aid. Yet there were 10,110 families, or between 35,000 and 40,000 persons, in the city destitute and to be supplied with their daily necessities.

The Governor called a special session of the Assembly to meet the emergency thus presented, but the city officials were warned that time would be needed to raise the money, and meanwhile the City must meet the demand.

The Senate Finance Committee and the Ways and Means Committee of the House of Delegates united in a resolution that they would recommend legislation for reimbursement of any money borrowed or advanced for relief by the City or any county. And shortly after this the City began meeting the calls. As the budget of taxes for the year had been made up in the preceding year, there was no possibility of providing for the outlays by new taxes, and resort was had to funds which were in the city treasury and not then required for other purposes, funds which under the charter (Charter and Pub. Loc. Laws [1938], section 41), should, if not used up in ordinary municipal expenditures by the end of the year, have been carried over for such expenditures in 1937. In chapters 3 and 10 of the Acts of 1936, 1st Ex. Sess., emergency measures were adopted by the State for raising the money for relief, and for reimbursing the City and the counties for the previous diversions of ordinary funds, and chapter 5 added a sub-section to section 6 of the City Charter to authorize emergency borrowing and debts without further legislative action, and restoration by that means of funds previously spent for relief.

The state taxes failed to bring the amounts required, and by the end of that year, 1936, the City had given relief to the extent of $1,000,000 more than it received from the State. The board of state aids and charities, in conjunction with city and county officials, then prepared for another effort, to raise by state taxes both the money which would be needed for relief in the years 1937 and 1938, and that needed to make the reimbursement of diverted local funds previously attempted. The General Assembly of 1937, Ex. Sess., adopted revenue measures, chapter 11, for these purposes, including the income tax to become payable in 1938. But again the expectations were disappointed, and relief expenditures by the City during 1937 amounted, in the end, to $1,097,041.91, and during 1938 to $1,550,190.98, in excess of the money received from the State. And, again, the excess expenditures, not having been provided for in the annual budget,

could be made by the City only from money dedicated by the Charter to other, ordinary purposes, or from borrowings. Borrowing was resorted to in June of 1938. The City is now confronted with the necessity of providing from its own resources payments of sums of money diverted from their ordinary uses.

The choice of the measures adopted to meet the emergencies in the three years past has been a subject of argument. It has been contended that more borrowing, or the levy of more taxes, would have provided an alternative to resort to the general cash account of the City, in contravention of the law of the Charter as it was. And to this it is replied that anticipatory borrowings to keep meeting demands of a varying, uncertain, number of destitute, with the aid of undetermined amounts from state taxes, were impracticable, and the more practical course of borrowing after actual expenditure of city money in hand would have been subject to the same criticism of violation of the Charter. As taxes during that period were already a severe burden, the officials trying to meet the problems might well have concluded that increases must be avoided if possible.

But criticisms of methods adopted to solve the problems of the past years do not advance us toward a solution of the problem presented now. That problem begins and ends with the resulting situation. If there is now an emergency within the meaning of the constitutional provision needing to be met, the authority to borrow for it without the popular vote exists. The Constitution does not permit the courts to make an exception of any one emergency because of fault, even illegality, in its origin.

The situation is, that when the City came to the task of providing funds for its expenses of 1939, $4,025,000 of funds, from its cash account, already collected in taxes, and regularly applicable to those expenses, funds which would have been in hand if the state measures for relief had been successful, were lacking. And we understand it to be conceded that they were needed. Instead of the expected restoration by the State, the City's own re-

sources had then to be turned to for new money to that amount as well as for the additional amounts required. It could make up the deficiency by an increase in taxation, adding, according to evidence taken, thirty-five cents or more to the tax rate. The ordinance adopted recited that this would be unduly burdensome, and the court can see that in the present economic conditions the burden could be found prohibitive. The delay incident to contracting a debt with the regular popular approval at the next municipal election, in May of 1930, might conceivably be fraught with danger to the performance of the necessary municipal functions, and render that resort impracticable. By reason of obstacles to the raising of the money by the ordinary processes then, the need of replacement might present an emergency for which borrowing without delay, borrowing, that is, without popular approval, would be the only recourse.

The constitutional authority for the borrowing has limits, and it is questioned whether this emergency could, as recited in the ordinance, come within the constitutional description of emergencies, "arising from the necessity of maintaining the police, or preserving the health, safety and sanitary condition of the city." The court concludes that as all the municipal functions alike would be affected by the provisions of a sum so large, the emergency could come within that description.

A question whether, under the constitutional authority, borrowing for emergencies may be other than temporary, or until the next tax levy and collections, seems to be answered by the fact that the word "temporarily" is used in the constitutional clause only in connection with another one of the two powers which the City may exercise, that is, it "may, temporarily, borrow any amount of money to meet any deficiency in the City Treasury, and may borrow any amount at any time to provide for any emergency," etc.

Of the addition to the Charter powers in the Act of 1936, 1st Ex. Sess., chapter 5, it is not necessary to say more than that it could not cut down the extent of the

power given the City directly by the Constitution, and that in point of fact it only adds to that power.

*Decree affirmed, with costs.*

OFFUTT, J., filed a separate opinion as follows:

I quite agree with the conclusion that the decree in this case must be affirmed, but I am not in entire agreement with this statement found in the opinion: "The choice of the measures adopted to meet the emergencies in the three years past has been a subject of argument. It has been contended that more borrowing, or the levy of more taxes, would have provided an alternative to resort to the general cash account of the City, in contravention of the law of the Charter as it was. And to this it is replied that anticipatory borrowings to keep meeting demands of a varying, uncertain, number of destitute, with the aid of undetermined amounts from State taxes, were impracticable, and the more practical course of borrowing after actual expenditure of city money in hand would have been subject to the same criticism of violation of the Charter. As taxes during that period were already a severe burden, the officials trying to meet the problems might well have concluded that increases must be avoided if possible. But criticisms of methods adopted to solve the problems of the past years do not advance us toward a solution of the problem presented now. That problem begins and ends with the resulting situation. If there is now an emergency within the meaning of the constitutional provision needing to be met, the authority to borrow for it without the popular vote exists. The Constitution does not permit the courts to make an exception of any one emergency because of fault, even illegality, in its origin." Although I do agree with so much of it as implies that the whole question before the court is whether there is now an emergency, not who brought it about, or why it was brought about, nor who is to be blamed for it. But after saying so much, the opinion does what it says should not be done, it deals with the

reasons for the emergency, and my objections are, first, that it deals with them at all, and second, to the manner in which it deals with them.

The emergency was caused by diverting funds dedicated to one use from that use to another use in order to render a needed public service for which, through a failure of anticipated revenue, there were no adequate funds, and of permitting the deficits resulting from the diversions to accumulate over a series of years.

Funds sufficient to meet the emergency caused by the sharp, sudden, and extraordinary expansion of unemployed relief could have been raised by methods which the Charter permitted, such as current taxation and temporary loans to meet a deficit resulting from the failure of anticipated revenue, or they could have been raised by methods not sanctioned by the Charter, by using funds dedicated to other purposes and permitting the diversions to accumulate until they could not be paid from current taxes without practical confiscation.

The opinion, by balancing the reasons for violating the law of the Charter, against the reasons for observing it, appears to countenance the doctrine that public officials may, in their discretion, obey the organic law, or transcend it, accordingly as the one course or the other seems most expedient. That to me seems to be a dangerous principle. If current needs are met from current taxes or temporary loans, the added burden will itself be sufficient notice to the taxpayer of the extent and necessity for the appropriation. But if they are met by shifting public funds from a use to which they are devoted by law, to other uses, and the deficits are funded, the taxpayer does not feel the burden, until the funds needed for the funded debt limit the funds available for present needs. So that while I do not think that the causes for the emergency are relevant to a consideration of the existence of an emergency, nevertheless, if they are dealt with at all, they should be so dealt with as to repudiate utterly the notion that public officials may observe or disregard the mandates and the limitations of the organic law at will.

The diversions appear to be in diametrical conflict with the Charter of Baltimore City (Charter and Public Local Laws, sec. 41, Code Pub. Loc. Laws 1938, art. 4, sec. 41), and, however compelling and persuasive the reasons for the disregard of the City's organic law may be, they do not seem sufficiently cogent to justify the conclusion that the law is after all merely directory, to be observed or disregarded at will as may seem at the moment most expedient.

The sole question before this court is one of fact, Is there an emergency? If there is, that is an end of this case; if there is not, that is an end of it, too. This court has no concern in why there is an emergency or who, if anybody, is to blame for it. So that consideration of causes, or reasons or blame, or excuse, should have no place in the opinion. But if such extraneous matters are to be considered at all, the consideration should recognize the rule that public officials charged with the administration of the law are themselves bound by the law.

The two questions, is there a deficit, and why is there a deficit, are distinct, and for the purposes of this case, unrelated.

As a result of the diversions, the city needs for indispensable necessities a sum so large that to collect it by direct and immediate taxation would impose an intolerable burden on the taxpayers; that is an emergency. Having decided that, the court has decided the case, and beyond that it ought not to go.