Burke, J.
Chapter 209 of the Laws of New York, 1962, together with concurrent New Jersey legislation (Laws of N. J., 1962, ch. 8), authorizes the Port of New York Authority, through the appellant subsidiary, to effectuate a single port development project to consist of the present Hudson & Manhattan Bail-road system and a new development to be known as the “ World Trade Center ”, all on a site in lower Manhattan, part of which is now occupied by the existing Hudson & Manhattan Terminal. Appellant is authorized to condemn property to achieve this purpose and, under this power, instituted the condemnation proceeding here challenged by respondents, who have an interest in the subject property. Bespondents argue that chapter 209 violates section 7 of article I of the New York Constitution and the United States Constitution (Matter of Hopper v. Britt, 203 N. Y. 144, 149; Missouri Pacific Ry. v. Nebraska, 164 U. S. 403) in that it authorizes the taking of private property by eminent domain for other than a public use.
The proposed World Trade Center is defined by statute as that part of the unified project that is “ a facility of commerce * * * for the centralized accommodation of functions, activities and services for or incidental to the transportation of persons, the exchange, buying, selling and transportation of commodities * # * in world trade and commerce * * * governmental services ”. It also states that as far as structures are concerned the World Trade Center also includes any such structure not devoted to railroad functions (thus preserving the distinction between the Hudson & Manhattan part of the project and the World Trade Center functions) even though portions of such structures are not functionally related to the project’s purpose and are used solely for “ the production of *388 incidental revenue * * * for the expenses of all or part of the port development project ” (ch. 209, § 2).
All of the Appellate Division Justices are agreed that the World Trade Center concept represents a public purpose. The majority found, however, the statute was on its face unconstitutional, in that the act granted a power to condemn property to be used for no other purpose than the raising of revenue for the expenses of the project, and for a class of tenants with a remote relationship with world trade. These conclusions were drawn from the inclusion in the definition of the term 1 ‘ incidental”. The definition refers to “ incidental ” revenue and ‘ ‘ functions * * * incidental to * * * the exchange, buying, selling # * * of commodities * * * in world trade and commerce ’ ’. The dissent read the definition as not including the power to condemn any independent areas separately accommodating only incidental revenue tenants not related to the World Trade Center concept. Therefore, it found that revenue production was incidental and not the primary purpose of the taking.
The prime issue, then, is whether the language of the act must be interpreted so as to authorize condemnation for the production of revenue without subordination to any primary purpose. If that is so the act goes beyond what the cases authorize (Bush Term. Co. v. City of New York, 282 N. Y. 306; Kaskel v. Impellitteri, 306 N. Y. 73; Cannata v. City of New York, 11 N Y 2d 210, app. dsmd. 371 U. S. 4) and beyond what can be constitutionally permitted. We think that the statute is valid.
The Appellate Division has stated that the concept of the World Trade Center is a public purpose. We understand this to mean that any use of the property sought to be condemned that is functionally related to the centralizing of all port business is unobjectionable even though private persons are to be the immediate lessees. The “ concept ” referred to by the Appellate Division can mean only that. It is the gathering together of all business relating to world trade that is supposed to. be the great convenience held out to those who use American ports and which is supposed to attract trade with a resultant stimulus • to the economic well-being of the Port of New York. This benefit is not too remote or Speculative as to render the means chosen to achieve it patently unreasonable; nor is the benefit sought *389 itself an improper concern of government. The history of western civilization demonstrates the cause and effect relationship between a great port and a great city. (See Pirenne, Economic and Social History of Medieval Europe, [Harcourt, Brace & Co., N. Y.].-) Postering harbor facilities has long been recognized by this court as the legitimate concern of government. (Matter of Mayor of City of N. Y., 135 N. Y. 253.) Even the centralization of inland trade has supported the exercise of the power of eminent domain for the establishment of public markets wherein private merchants plied their trades. (Matter of Cooper, 28 Hun 515, app. dsmd. 93 N. Y. 507; Peterson v. Mayor of City of N. Y., 17 N. Y. 449; Ketchum v. City of Buffalo, 14 N. Y. 356.) More recently the indirect benefits deriving from slum clearance and from a “ plan to turn a predominantly vacant, poorly developed and organized area into a site for new industrial buildings ” have justified condemnation (New York City Housing Auth. v. Muller, 270 N. Y. 333; Cannata v. City of New York, 11 N Y 2d 210, 215, supra). To retreat from the public importance of piers, markets and slum clearance, even esthetic improvements have been held to be a public purpose justifying condemnation (Berman v. Parker, 348 U. S. 26). No further demonstration is required that improvement of the Port of New York by facilitating the flow of commerce and centralizing all activity incident thereto is a public purpose supporting the condemnation of property for any activity functionally related to that purpose. Nor can it be said that the use of property to produce revenue to help finance the operation of those activities that tend to achieve the purpose of the project does not itself perform such a function, provided, of course, that there are in fact such other activities to be supported by incidental revenue production (Bush Term. Co. v. City of New York, 282 N. Y. 306, supra). The crux of the problem here, however, is that the statute has been read by the Appellate Division as allowing unfettered erection of structures that are solely revenue producing. As the dissent below maintains, this misreads the statute. The act was construed so ás to raise rather than settle a constitutional question. We have said that where there are two possible interpretations the court will accept that which avoids constitutional doubts. ' (Kauffman & Sons Saddlery Co. v. Miller, 298 N. Y. 38, 44; Matter of Coates, 9 N Y 2d 242, 253.)
*390 The act may properly be read to authorize only incidental extensions of a site required for a public use. This is best understood not by reference to only portions of the language of the statute but by reading all the language in context as an entire definition.
The entire definition follows: u 1 World trade center ’ shall mean that portion of the port development project constituting a facility of commerce consisting of one or more buildings, structures, improvements and areas necessary, convenient or desirable in the opinion of the port authority for the centralized accommodation of functions, activities and services for or incidental to the transportation of persons, the exchange, buying, selling and transportation of commodities and other property in world trade and commerce, the promotion and protection of such trade and commerce, governmental services related to the foregoing and other governmental services, including but not limited to custom houses, customs stores, inspection and appraisal facilities, foreign trade zones, terminal and transportation facilities, parking areas, commodity and security exchanges, offices, storage, warehouse, marketing and exhibition facilities and other facilities and accommodations for persons and property and, in the case of buildings, structures, improvements and areas in which such accommodation is afforded, shall include all of such buildings, structures, improvements and areas other than portions devoted primarily to railroad functions, activities or services or to functions, activities or services for railroad passengers, notwithstanding that other portions of such buildings, structures, improvements and areas may not be devoted to purposes of the port development project other than the production of incidental revenue available for the expenses of all or part of the port development project.” (Laws of N. Y., 1962, ch. 209, § 2.)
Even without resort to familiar canons of construction that control when a statute is called into question on constitutional grounds, the statute, it seems to us, allows only “ portions ” of structures otherwise devoted to project purposes to be used for ‘ ‘ the production of incidental revenue * * * for the expenses of all or part of the port development project.” Thus considered it does not vitiate the public purpose of the development as a whole. (Bush Term. Co. v. City of New York, 282 *391 N. Y. 306, supra.) As to the fears expressed by the respondents that the Port Authority may illegally seize a particular piece of property for an unauthorized nonpublic use, it is sufficient to say that the condemnation procedures prescribed by statute fully protect the respondents and others in like position against any taking for nonpublic purposes in violation of the Port Development Project Law.
Respondents also argue that chapter 209 is unconstitutional (under the compact clause, U. S. Const., art. I, § 10) because no additional congressional consent has been obtained for this bi-State legislation. This argument must fail because, assuming consent to be required for this sort of concurrent action, the congressional consent originally given in 1921 and 1922 to the bi-State compact creating the Port Authority expressly contemplated such further co-operative legislation in furtherance of port purposes as was here accomplished. (Pub. Res. No. 17, 67th Cong., 1st Sess., 42 U. S. Stat. 174; Pub. Res. No. 66, 67th Cong., 2d Sess., 42 U. S. Stat. 822.) Among the Articles of Agreement consented to were articles III, VII and VI, which created the Port Authority with the powers enumerated plus “ such other and additional powers as shall be conferred upon it by the legislature of either state concurred in by the legislature of the other ”. Similarly, article XI, following the agreement for an initial comprehensive plan in article X, provides that the Port Authority should ‘ ‘ from time to time make plans for the development of said district, supplementary to or amendatory of any plan theretofore adopted, and when such plans are duly approved by the legislatures of the two states, they shall be binding upon both states with the same force and effect as if incorporated in this agreement.” Chapter 209 clearly falls within the congressional consent given to the articles contemplating the grant to the Port Authority of additional powers within the framework of the compact.
Respondents’ contention that the statute is an unconstitutional rule of law because it does not recognize business good will as an item to be considered in valuation is not well taken. Not only is such an argument premature since the statute is general in terms and a trial on valuation is yet to be had, but the noncompensability of good will is settled by our decisions. (Banner Milling Co. v. State of New York, 240 N. Y. 533.) *392 Kimball Laundry v. United States (338 U. S. 1), cited by respondents, is not in point. There it was merely held that where the Federal Government took over a laundry business for a short period, and where the going concern was to be continued rather than using the land for a different purpose, the Fifth Amendment required payment for the going concern value.
Respondents’ other contentions regarding the powers of the subsidiary corporation used by the Port Authority to acquire the subject property need not long detain us. Contrary to respondents’ position, the subsidiary has been granted the power of eminent domain. Sections 14 and 16 of chapter 209 expressly so provide. The prohibition in section 12 against the contraction of indebtedness by the subsidiary does not detract from the express grant of the power to condemn. We have often held that all portions of a statute must be given effect in a harmonious construction. (Matter of Dowling, 219 N. Y. 44, 56; Matter of Kaplan v. Peyster, 273 N. Y. 147, 149-150; Matter of Tonis v. Board of Regents, 295 N. Y. 286, 293.) The prohibition directed against the contraction of indebtedness should not derogate from a grant reading: “ The powers hereby vested in the port authority and in any subsidiary corporation * * * (including but not limited to the power to acquire real property by condemnation) shall be continuing powers ”. Respondents’ claim to a hearing before making the determination to take this property for a public purpose is equally without merit. Any provision for a hearing contained in section 1 of chapter 623 of the Laws of 1924 was conditioned, as usual, on Few Jersey’s concurrence which was consistently denied by that State. The identification of respondents’ property was made by the Legislatures themselves in the statutes authorizing this project and no hearing could change this fact. The only hearing to which respondents are entitled (Fifth Ave. Coach Lines v. City of New York, 11 N Y 2d 342) has been given in the instant proceedings wherein full opportunity has been afforded respondents to raise their objections.
Lastly, we do not agree with the objection raised in the concurring opinion of Justice Steuer that the authority given appellant to go ahead immediately with the Hudson Tubes portion of the project in advance of any taking for the World Trade Center violates the legislative determination,of inseparability, *393 because it may eventually appear that the World Trade Center is impossible of fulfillment. The Legislature decided that the two are inseparable. It also directed the Port Authority to “ proceed as rapidly as may be practicable to accomplish the purposes of this act.” Appellant is given no discretion to abandon the World Trade Center; legally it is obliged to create it. Impossibility that may arise because of external circumstances is a matter for the Legislature to consider when it authorizes the project, not a subject for this court to speculate upon and conclude that appellant is thereby given power to sever the project in violation of statutory command.
The orders appealed from should be reversed, the orders of Special Term in the condemnation proceeding reinstated, a judgment rendered that chapter 209 of the Laws of 1962 is constitutional, and the certified question answered in the negative.