LERCH *v.* MARYLAND PORT
AUTHORITY, ET AL.

[No. 268, September Term, 1965.]

440

*Decided November 26, 1965.*

The cause was argued before PRESCOTT, C. J., and HORNEY, MARBURY, OPPENHEIMER and BARNES, JJ.

*Edward O. Clarke, Jr.,* with whom were *Richard W. Case* and *Smith, Somerville & Case* on the brief, for appellant.

*Lewis A. Noonberg* and *Charles C. G. Evans,* with whom were *Piper & Marbury* on the brief, for appellees.

OPPENHEIMER, J., delivered the majority opinion of the Court, in which PRESCOTT, C. J., concurs. Concurring opinion at page 463, *infra*.

This appeal involves the validity of a proposed issue of revenue bonds by the Maryland Port Authority for the acquisition and construction of an International Trade Center in the port of Baltimore. Under the proposed issue, the Authority may be required to deposit with the trustee under the trust agreement monies which, with the proceeds of the bonds, shall be used to pay the cost of the Center, and the Center is to be conveyed to the trustee as security for the payment of the principal of and interest on the bonds. The trust agreement is to provide that the Authority may make arrangements for the leasing of portions of the Center which may not be devoted to purposes of the Center other than for the production of incidental revenue for expenses and financial obligations of the Authority in connection with the Center. The appellant, a resident, taxpayer, voter, and property owner in Baltimore City, brought a petition in the Circuit Court No. 2 of Baltimore City for an injunction and declaratory relief against the Authority and its members, on the ground that the act of the General Assembly and the Authority's resolution under which the bonds are to be issued, are unconstitutional, null and void. The appellees answered and a hearing was held at which testimony was taken. The Chancellor filed an opinion holding the statute valid and the Authority's contemplated action lawful. This appeal is taken from the decree dismissing the bill.

The Authority is an instrumentality of the State of Maryland; it was created by Chapter 2 of the Laws of Maryland of 1956 (March Special Session), as amended, now codified as Sections 1-25, inclusive, of Article 62B of the Annotated Code of Maryland (1964 Replacement Volume), as amended (the Act).

Section 10 of the Act authorizes and empowers the Authority to issue bonds for the purpose of providing funds for paying the cost of any "port facilities", which are defined in Section 4 of the Act. Section 10(d) states that bonds issued under its provisions shall not be deemed to constitute a debt of the State or of any political subdivision thereof or a pledge of the faith

and credit of the State or of any such political subdivision. Section 10 also provides that such bonds "shall be stated to mature at such time or times, not exceeding forty (40) years from their date, as may be determined by the Authority."

Section 12 provides that bonds issued under the Act "shall be secured by a trust agreement by and between the Authority and a corporate trustee, which may be any trust company, or bank having the powers of a trust company, within or without the state."

Chapter 602 of the Laws of Maryland of 1965 (Chapter 602) authorized the financing of an international trade center by amending Section 4 of the Act to include an "international trade center" within the definition of the term "port facility" for which bonds might be issued by the Authority under Section 10. Chapter 602, which recited that it took effect from the date of its passage, was signed by the Governor on April 8, 1965; it added the following language to Section 4:

> "The term 'port facility' also shall mean and shall include an international trade center constituting a facility of commerce and consisting of one or more buildings, structures, improvements and areas necessary, convenient or desirable in the opinion of the Authority for the centralized accommodation of functions, activities and services for or incidental to the transportation of persons by water, the exchange, buying, selling and transportation of commodities and other property in international and national water-borne trade and commerce, the promotion and protection of such trade and commerce, and governmental services related to the foregoing and other Federal, State and municipal agencies and services, including but not limited to foreign trade zones, offices, marketing and exhibition facilities, terminal and transportation facilities, custom houses, customs stores, inspection and appraisal facilities, parking areas, commodity and security exchanges, and, in the case of buildings, structures, improvements and areas in which such accommodation is afforded, shall in-

clude all of such buildings, structures, improvements and areas, notwithstanding that other portions of such buildings, structures, improvements and areas may not be devoted to purposes of the international trade center other than the production of incidental revenue available for the expenses and financial obligations of the Authority in connection with the international trade center."

On April 8, 1965, the Governor also signed Senate Bill No. 457, which was designated Chapter 603 of the Laws of Maryland of 1965 (Chapter 603). Chapter 603 similarly recited that it would take effect from the date of its passage; it amended Sections 10 and 12 of the Act to provide that the trust agreement securing bonds issued under the Act "in the event that such bonds are issued for the purpose of providing funds for paying the cost of any port facility, may convey or assign such port facility as security for the payment of the principal of and the interest on such bonds."

On April 9, 1965, the members of the Authority adopted the Resolution which provided for the Authority to proceed with its plan and program for developing an international trade center as contained in a report approved by the Authority on March 24, 1965. The Resolution authorized the following steps, if necessary to make the plan and program feasible:

1. The Authority will issue bonds pursuant to the Act, as amended by Chapters 602 and 603. The Resolution contemplated that the trust agreement securing such bonds may contain

(i) "a provision requiring the Authority to deposit with the trustee under the trust agreement monies in a specified amount simultaneously with the execution and delivery of the trust agreement, which monies, together with the proceeds of the bonds, shall be used to pay the cost of an international trade center in the port of Baltimore," and

(ii) "a provision conveying or assigning the international trade center to said trustee as security for the payment of the principal of and interest on the bonds

and authorizing said trustee to sell such international trade center upon default in the payment of principal of or interest on the bonds and to apply the proceeds of sale to the payment of the principal of and interest on said bonds."

2. The Authority will make arrangements for the leasing of portions of the international trade center "which may not be devoted to purposes of the international trade center other than the production of incidental revenue available for the expenses and financial obligations of the Authority in connection with the international trade center."

The Resolution provided that the bonds should contain a statement on the face thereof that neither the Authority nor the State nor any subdivision thereof shall be obligated to pay the same or the interest thereon except from revenues and from the proceeds of any security held by the trustee and that neither the faith and credit nor the taxing-power of the State or any political subdivision thereof is pledged to the payment of the principal of or interest on such bonds.

Mr. W. Gregory Halpin, Deputy Director of the Maryland Port Authority, was the only witness at the hearing below. His testimony was uncontradicted. He testified regarding the Authority's plans for the Center. The Authority has already spent approximately $7,000 of public funds in the planning and development of the Center, and $100,000 has been budgeted for the fiscal year which commenced July 1, 1965.

The Authority has selected a site for the Center, an area south of the present Authority facilities at Pier No. 2, Pratt Street, in the inner harbor itself. At present there are no defined limits to the size of the Center. The Center will be part of Baltimore City's planned redevelopment of the inner harbor and City Hall plaza which calls for extensive changes in the area surrounding the inner harbor. Pratt Street will be widened still further than its present six lanes, and the Center will be connected by a pedestrian bridge or overpass to the City Hall plaza or mall which will lead to a complex of municipal government buildings and adjacent commercial buildings. The Center is planned to be one of the first, if not the first, major proj-

ect completed in the redevelopment of the inner harbor. Other portions of Mr. Halpin's testimony will be referred to in the discussion which follows.

The appellant, to support his conclusion that Chapter 603 and the Authority's Resolution are unconstitutional, null and void, makes three contentions, several of which are double-pronged. The same contentions were made below. For the purposes of this opinion, we have re-arranged the order in which they were presented. They are as follows: I—The development and construction of the Center is not a public purpose; and, in any event, the leasing of portions of the Center for the production of incidental revenues would defeat any public purpose. II—The use of the Authority's general funds to construct the Center and the conveyance or assignment of the Center to a trustee as additional security for bonds as proposed by the Authority would be the contracting of a debt in violation of Section 34 of Article III of the Maryland Constitution. III—The construction of the Center, coupled with leasing of a portion of the Center for the production of incidental revenues, would give or lend the credit of the State in aid of individuals, associations or corporations and would involve the State in the construction of works of internal improvement, all in violation of Section 34 of Article III of the Maryland Constitution.

## I

The first part of the appellant's contention, under this heading, is that the development of the Center is not a public purpose. In his able opinion, Judge Prendergast stated certain uncontrovertible facts. He said:

> "Baltimore is a city built around a seaport. Without the port there would be little reason for the existence of the city in its particular location, and Baltimore might have encountered long ago the fate of its rival in Colonial days, Joppa. With the growth of the port, the City has become a large metropolis so that it is a matter of grave public concern that the port at all times be maintained at peak size and efficiency. In recent years strong competition has arisen with the building of the St. Lawrence Seaway and certain

modifications of tariff rates favorable to northern ports."

In *Marchant v. Mayor and City Council of Baltimore,* 146 Md. 513, 126 Atl. 884 (1924), we held valid an act of the General Assembly authorizing the Port Development Commission of Baltimore to condemn property for the comprehensive development of the city's port. It was urged that the condemnation of private property under the act violated the constitutional limitation of the power of eminent domain to the taking of property solely for a public use. We said:

"In view of the objects to which the act is directed, and of the important public service which it was designed to promote, we are of the opinion that the objection to its validity should not prevail. The development of the harbor of Baltimore according to a comprehensive plan, by which the commerce of the port will be most advantageously served, and its future growth encouraged, is a project of distinctively public interest and purpose. It is concerned with the improvement and extension of a harbor service which constitutes an essential part of a system of water transportation connecting the port of Baltimore with the markets of the world." 146 Md. at 521.

In *Frostburg v. Jenkins,* 215 Md. 9, 136 A. 2d 852 (1957), we held constitutional an enabling act of the General Assembly which authorized the City of Frostburg to issue municipal bonds to acquire a site and contribute to the cost of constructing a building to be used by a privately owned manufacturing company. The Court (Prescott, J. dissenting) found that the legislation had a substantial relation to the public welfare and could fairly be said to have a public purpose. Judge Henderson, for the Court, said:

"The only declaration of public policy in the enabling act before us is the statement that the power is granted 'in order to encourage industrial development'. The legislative purpose, however, is somewhat amplified in the allegations of the answer, which are

admitted for the purpose of this case, and we might, indeed, take judicial notice of the fact that the location of new industry in a municipality furnishes employment and measurably increases the resources of the community and its financial well-being." 215 Md. at 16.

Here, the declaration of public policy in the enabling act is far stronger than it was in *Frostburg*. The preamble to Chapter 602 sets forth legislative findings that the unification at a single, centrally located site of servicing functions and activities connected with water-borne commerce and trade has the single object of preserving the economic well-being of the State and is in the public interest.[1] Such legislative findings are entitled

---

1. The preamble to Chapter 602 is as follows:

"WHEREAS, The General Assembly hereby finds and determines:

"(1) that the servicing functions and activities connected with the water-borne commerce and trade of the ports and harbors of the State of Maryland, including customs clearance, shipping negotiations, cargo routing, freight forwarding, financing, insurance agreements and other similar transactions which are presently performed in various scattered locations, should be centralized to provide more efficient and economical facilities for the exchange and buying, selling and transportation of commodities and other property in international and domestic water-borne trade and commerce and for making arrangements for and handling passenger service by water, and matters incidental thereto; and

"(2) that unification, at a single, centrally located site, of a facility of commerce accommodating the said functions and activities described in paragraph (1) above and the appropriate governmental, administrative and other services connected with or incidental to the transportation of persons and property by water and the promotion and protection of port commerce, and providing a central locale for exchanging and otherwise promoting the exchange and buying and selling of commodities and property in water-borne trade and commerce, will materially assist in preserving for the State of Maryland and the residents of all parts of the State the material and other benefits of prosperous port communities; and

"(3) that the undertaking of the aforesaid unified facil-

to substantial weight. *Geisendaffer v. Mayor and City Council of Baltimore*, 176 Md. 150, 152-53, 3 A. 2d 860 (1939), cf. *Washington Suburban Sanitary Comm'n. v. Buckley*, 197 Md. 203, 209-10, 78 A. 2d 638 (1951).

In *Courtesy Sandwich Shop v. Port of N. Y. Authority*, 12 N. Y. 2d 379, 190 N. E. 2d 402, *appeal dismissed*, 375 U. S. 78 (1963), the New York Court of Appeals had before it the validity of a law authorizing the Port of New York Authority to condemn land for a development to be known as the "World Trade Center" in lower Manhattan.[2] One of the grounds of attack was that the Center concept did not represent a public purpose. The court held it did, saying:

> "The history of western civilization demonstrates the cause and effect relationship between a great port and a great city. (See Pirenne, Economic and Social History of Medieval Europe, [Harcourt, Brace & Co., N. Y.].) Fostering harbor facilities has long been recognized by this court as the legitimate concern of government. (*Matter of Mayor of City of N. Y.*, 135 N. Y. 253.) * * * No further demonstration is required that improvement of the Port of New York by facilitating the flow of commerce and centralizing all activity incident thereto is a public purpose supporting the condemnation of property for any activity functionally related to that purpose." 12 N. Y. 2d at 389.

The appellant argues that, in *Marchant*, the authority to condemn was in connection with the development of wharves, docks,

---

ity of commerce by Maryland Port Authority has the single object of preserving, and is part of a unified plan to aid in the preservation of, the economic well-being of the State of Maryland and its residents and is found and determined to be in the public interest."

2. Laws of N. Y., 1962, ch. 209, § 2 defined "World Trade Center" as "a facility of commerce consisting of one or more buildings, structures, improvements and areas necessary, convenient or desirable in the opinion of the port authority for the centralized accommodation of functions, activities and services for or incidental to the transportation of persons" and commodities in world trade and commerce.

piers and warehouses, and not, as here, offices, restaurant and banks. He points out that the Port Development Act there involved related to port facilities, whereas, in the present case, it is the centralization of office operations which is involved. The short answer to this contention is that the methods by which a public purpose is served change with the times; in the world of today, services are often more important than edifices. As Judge Henderson said for the Court in *Frostburg*, what is a public purpose for which public funds may be expended is not a matter of exact definition, but almost entirely a question of general acceptance. "[T]he line of demarcation is not immutable or incapable of adjustment to changing social and economic conditions that are properly of public and governmental concern." 215 Md. at 16.

As to *Frostburg*, the appellant argues that there the public purpose of encouraging industrial development could only be accomplished if the city constructed the plant, while here it is not possible to say that the Center will necessarily cause more trade in Baltimore. But the validity of the means chosen to carry out a public purpose does not depend upon proof that the means will be successful. The favorable outcome of economic measures can no more be demonstrated in advance than can the postulates of social legislation. It is for the legislature, not the courts, to make the determination. "So long as the legislation has a substantial relation to the public welfare and can fairly be said to serve a public purpose, it is not the court's function to strike it down, merely because we fear it may lead to unwise or unfortunate results." *Frostburg, supra,* at 19.

The second prong of the appellant's contention as to the purpose of the Center not being a public one rests for its thrust upon the contention that the plan to lease portions of the building to tenants wholly unrelated to the maritime industry defeats any public purpose. Chapter 602 permits the leasing of portions of the Center not leased for maritime purposes other than for the production of incidental revenue for the Authority's expenses and financial obligations. Mr. Halpin testified that the Authority planners are of the view that the Center may consist of a building of 200,000 square feet divided into twenty stories of 10,000 square feet each. It is reasonably certain that

the building will include at least twelve or thirteen stories each of 10,000 square feet. Of the total floor space available, the Authority will occupy up to 30,000 square feet which will represent an expansion of up to 18,000 square feet from its present 12,000 square feet. This expansion will be made to accommodate present and future increases in personnel as well as to provide additional facilities such as meeting rooms. Within the range of economically feasible size, the Authority "intends" to lease to tenants whose businesses are maritime oriented, including the Authority, and to maritime oriented governmental agencies such as the Customs Bureau. Although the tenants are not known, it is certain that portions of the trade center will be leased to "service" businesses, which would be patronized by non-tenants of the Center. Such "service" tenants could include a bank and a cafeteria, or even a laundry. The Authority presently intends to provide for a restaurant on the top floor. This restaurant would be operated by private business and is planned to be of such a size and quality that it will become a focal point for dignitaries as a prime reception facility. It will serve persons from all over the City of Baltimore, particularly from the downtown area. It is probable that some portions of the Center will be leased to other non-maritime tenants. The Department of Transit and Traffic of the City of Baltimore may be a tenant, to the extent of about 25,000 square feet.

In *Marchant,* we said:

> "The public character of the use to which the harbor structures are devoted is not affected by the fact that they may not all be made available for the indiscriminate use of the public. By the allocation or lease of certain docks for the separate use of persons or corporations having a regular or continuous need of such conveniences, the city does not convert into a private use the public port service which is thus in part provided." 146 Md. at 521.

In *Frostburg,* we said:

> "In the instant case there are obvious benefits passing to the private corporation, and enuring to the benefit of its stockholders * * * But whether these

private benefits outweigh the public benefits accruing from the location of the plant within the municipality seems to us to be primarily a legislative rather than a judicial problem." 215 Md. at 17.

The New York statute before the court in *Courtesy Sandwich Shop* is virtually identical in its provision as to leasing of portions of the structure for incidental revenue with the portion of the Maryland act here considered. As to this provision, the New York Court of Appeals said:

> "Nor can it be said that the use of property to produce revenue to help finance the operation of those activities that tend to achieve the purpose of the project does not itself perform such a function, provided, of course, that there are in fact such other activities to be supported by incidental revenue production (*Bush Term. Co. v. City of New York*, 282 N. Y. 306, *supra*)." 12 N. Y. 2d at 389.

We agree with the reasoning of the New York court. That parts of the Center are to be used for maritime purposes connected with the Port is clear. We cannot assume that the portion of the structure to be used by the Authority itself will not, in the future, be materially larger. Mr. Halpin testified that he had studied the development of trade centers in other ports; it was his conclusion, which was uncontroverted, that the Center would substantially increase port business. Such an increase, presumably, would attract other maritime oriented business to the Center. The Act is not invalid because it does not freeze future use to present circumstance. Nor does it violate the constitutional prohibition because it authorizes the use of space not needed for the purpose of the Center other than for the production of incidental revenue, when, as here, that authorization is a reasonable concomitant of a project based on a public purpose.

The appellant argues that *Courtesy Sandwich Shop* is not here in point because the high land costs in Manhattan may make some self-supporting public facilities impossible, without incidental revenue. He contends that New York is faced with

a unique situation and that, because land costs are lower in Baltimore, incidental revenues do not come within the meaning of public purpose in Maryland. We have found that the development of the Center is a public purpose. Land values are relative. What is the best economic use of public land for a public purpose is a question for legislative, or, if authorized, administrative determination. In Chapter 602, the Legislature evidenced its awareness of the multiple purposes the Center could properly serve, and expressly provided for space devoted only to the production of incidental revenue. The Act, as amended, incorporates not only the legislative determination of the broad scope of the Center, but, at least by implication, looks to the eventual expansion of the immediate use to which the Center is to be put. No separate edifice is authorized for the purpose of raising revenues to offset the expenses of the Center. The authorized use of portions of the Center for the production of incidental revenue is not its primary purpose, but is expressly made auxiliary to the accomplishment of the main purpose, which is public.

II

Section 34 of Article III of the Maryland Constitution provides in part as follows:

> "No debt shall be hereafter contracted by the General Assembly unless such debt shall be authorized by a law providing for the collection of an annual tax or taxes sufficient to pay the interest on such debt as it falls due, and also to discharge the principal thereof within fifteen years from the time of contracting the same; * * * The credit of the State shall not in any manner be given, or loaned to, or in aid of any individual association or corporation; nor shall the General Assembly have the power in any mode to involve the State in the construction of works of internal improvement, nor in granting any aid thereto which shall involve the faith or credit of the State; * * *"

The Act makes no provision for the levy and collection of taxes to pay the principal of and interest on bonds issued by the Authority, nor does it require the payment of bonds within fif-

teen years. If the proposed bonds would constitute a debt in the constitutional sense, the debt cannot be contracted by the General Assembly or by the Authority as an instrumentality of the State. The appellant contends that a debt would be created, first, because under the Authority's Resolution, monies in a specified amount from the Authority's general funds are to be used, with the proceeds of the bonds, to pay the cost of the Center; and, second, because, under the Act, the Center is to be conveyed to the trustee under the trust agreement as security for the payment of the principal of and interest on the bonds, with authority to sell the Center upon default.

The history of the credit clause in our Constitution was set forth by Chief Judge Marbury, for the Court, in *Johns Hopkins Univ. v. Williams,* 199 Md. 382, 388-94, 86 A. 2d 892 (1952). He summarized his discussion in these words:

> "The unquestionable historical reason for the proposal of the constitutional section, both in New York and in Maryland, was to curb the reckless and improvident investment of public funds in aid of railroads and canals, promoted by private corporations, organized primarily for profit to their stockholders, although they might eventually serve a public purpose. That was the evil that had impaired or threatened the credit of these and other states, and that was the evil primarily in the minds of the framers of our constitution of a hundred years ago. Whatever they said in that instrument must be considered in the light of what they were trying to prevent in the future. Now, a century later, we must decide whether, by what they then said, they foreclosed something which was not and could not have been envisioned by them, and which had no relation whatever to the problems they were facing." 199 Md. at 398-99.

See also, *Bonsal v. Yellott,* 100 Md. 481, 498-99, 60 Atl. 593 (1905) and Hanna, *Financial History of Maryland, 1789-1848,* 70-104 (1907).

We have had occasion to consider the meaning and application of the clause in prior decisions. *Mayor and City Council*

*of Baltimore v. Gill,* 31 Md. 375 (1869) involved the validity of an ordinance of the Mayor and City Council of Baltimore. Section 7 of Article XI of the Constitution of 1867 prohibited Baltimore from creating a debt, in language substantially similar to that of Section 34 of Article III, unless the debt was authorized by the General Assembly and by an ordinance of the City approved by a majority of the voters. Gill and other taxpayers filed a bill of complaint. The bill alleged that the ordinance provided for the raising of $1,000,000 by the City by the hypothecation of such number of shares of the Baltimore and Ohio Railroad Company owned by the City as might be necessary, the proceeds to be invested in the bonds of the Western Maryland Railroad Company, with a provision that those who advanced the money were to look only to the stock pledged for security. The Baltimore and Ohio stock, it was alleged, paid regular dividends of eight per cent. and was selling at about twenty per cent. above par; the proceeds of the loan were to be used for the completion of the Western Maryland road, and the bonds of that railroad had no market value. The bill charged that the ordinance was not in good faith, and that its real purpose was to borrow funds to be expended in the construction and equipment of the Western Maryland Railroad. The City demurred, the demurrer was overruled, and, on appeal, we affirmed. We held that the plain intent of the transaction was to create a debt of the City within the meaning of the Constitution by the pledge of valuable assets. The provisions of the ordinance that the parties loaning the money shall look only for its repayment to the stock pledged and that in no event was the City to be liable for the repayment were ineffectual to avoid the restrictions imposed by the Constitution; the pledge of the stock might result in imposing additional burdens upon the citizens which might directly or indirectly involve increased taxation.

*Wyatt v. State Roads Comm'n.,* 175 Md. 258, 1 A. 2d 619 (1938) involved the constitutionality of revenue bonds to be issued by the Commission. As in the present case, both the statute and the form of bonds provided they shall not constitute a debt or obligation of the State. We held that a debt was not created in violation of the constitutional provision by the issu-

ance of revenue bonds by the Commission for financing the cost of the Susquehanna River bridge, when it was expressly provided that the bondholders were to look solely to the revenues of the bridge for the payment of principal and interest. We held, further, that a debt was not created by the Commission's covenant in the trust agreement securing the bonds to maintain the bridge. Chief Judge Bond, for the Court, said:

> "It has been argued that resort to the device [of revenue bonds] is a circumvention of the constitutional purpose, but the courts are not warranted in adding prohibitions to constitutional provisions, beyond those formulated and adopted by the framers. Only the one specific restriction on the Legislature was adopted to guard against improvidence and bad financing, and restraint beyond that was left to the General Assembly itself. The Assembly was given the chief part of the task of deciding questions of financial policy, and if the courts should govern their decisions on constitutional questions by their views of what was and what was not wise beyond the limitations expressed, they would be usurping functions * * *

> "The Constitution does not prohibit all burdens, or require all contracts of the State, to be accompanied by laws for levies of taxes to meet them. It deals with burdens of a kind. And an undertaking to pay undetermined, undeterminable, amounts of the cost of maintenance, repair, and operation in the future from day to day, month to month, and year to year, as need arises, if it can be classed as containing an element of debt at all, is not one for which taxes to pay interest and principal, and to pay the principal completely in fifteen years, might be provided in a tax law." 175 Md. at 267-68.

In *Castle Farms Dairy Stores, Inc. v. Lexington Mkt. Authority*, 193 Md. 472, 67 A. 2d 490 (1949) we held constitutional the statute creating the Lexington Market Authority. The statute provided for the issuance by that Authority of revenue bonds which were not to constitute a debt of the City or

a pledge of its faith and credit. A substantial part of the old market had been destroyed by fire; before the fire, it had yielded the City no net income but was operated at a loss. Under the statute, the Market Authority had power to acquire from the City the whole or any part of the existing market, but the City stated it intended to incorporate in the deeds conveying the lands a provision that they should not be subject to execution or attachment for the debt of the Market Authority, and that if a receiver or trustee were appointed, he could use the land conveyed, but would not have power to alienate the land or divert it from use as a market. We held that the statute did not authorize creation of a debt by the City. The appellants contended and the Authority disputed that, on the authority of *Gill,* a pledge of existing revenue-producing property is undistinguishable from creation of a debt. Judge Markell, for the Court, said, as to this argument:

> "We need not decide between these opposing contentions. For present purposes we shall assume that plaintiffs' contention is correct. On this assumption plaintiffs' contention is not in point, because (a) the existing market has not been revenue-producing but has been operated at a loss, and (b) it is not to be turned over to the Authority without compensation, but is to be sold for a presumably fair price." 193 Md. at 483-84.

In *Johns Hopkins Univ. v. Williams, supra,* suit was brought against the members of the Board of Public Works of Maryland for a declaratory decree that a statute providing for a State loan of $1,500,000, the net proceeds of which were to be paid to the University for the construction of a new engineering building, was unconstitutional because it was in violation of the constitutional provision that the credit of the State shall not be given or loaned to any individual association or corporation. We reversed the decree of the lower court which held the statute void. Chief Judge Marbury, for the Court, said:

> "If the State should have a balance of a million and a half in its treasury from annual receipts, there could be no constitutional objection to its giving this amount

to the Johns Hopkins University for the purpose of constructing an engineering building. If the State does not have this amount available, but borrows it and then gives the cash to the University, which is what it is attempting to do, it is not giving or loaning its credit to, or in aid of, the University—it is using its credit with banking institutions to borrow the money, and it is giving the University its cash." 199 Md. at 401.

The provisions of the Act and the Resolution here under attack are to be considered in the perspective of the historical and decisional background. We shall first consider the application of some of the Authority's general funds to the construction of the Center, and then the pledging of the Center itself.

The Authority has spent $7,000 of its general funds and budgeted $100,000 more for the fiscal year which commenced July 1, 1965 for the development of the Center. The Resolution does not state the total amount which the Authority may be required to deposit with the trustee. Mr. Halpin testified that the amount might be as much as $1,000,000 under the present plan. However, consent of the Authority to such a commitment would be necessary. The Authority's annual report for the fiscal year ending June 30, 1964 shows an operating fund balance of over $5,600,000.

The amount actually spent and budgeted by the Authority is an insignificant part of its general funds. While additional funds may be committed by the Authority to be turned over to the trustee towards the planning and construction of the Center, the Court cannot assume that any such additional commitment will not bear a reasonable relationship to the Authority's available cash resources. There is a strong presumption that public officers properly perform their duties. *Fidelity & Casualty Co. v. Riley,* 168 Md. 430, 433, 178 Atl. 250 (1935) ; *Union Trust Co. v. State,* 116 Md. 368, 372, 81 Atl. 873 (1911).

As was pointed out in *Johns Hopkins, supra,* cash is not credit and the use of cash does not create a debt. Cash is property, but the present expenditure of cash from current revenues

does not create a situation such as existed in *Gill* whereby valuable existing property of the State may be lost. In *Gill,* the pledging of the City's valuable and income-producing stock was an obvious subterfuge whereby, in effect, although not in terms, the City's credit was involved. A sale of the stock, on default, could have resulted in increased taxation. In *Wyatt,* there was no provision for the assignment or conveyance of any State property for the revenue bonds, but, in discussing *Gill,* we referred to the fact that, there, valuable stock owned by the City was to be pledged for securities of a railroad under construction. In *Castle Farms,* the land on which the old market stood was to be conveyed to the Market Authority, but we pointed out, *inter alia,* that the existing market had not been revenue-producing and had been operated at a loss.

The majority view in other jurisdictions is in accord with *Gill,* that when existing valuable, income-producing property of the political subdivision is mortgaged as security for the payment of bonds used to finance the construction of a facility, a debt is created. See Annots. *Pledge or appropriation of revenue from utility or other property in payment therefor, as indebtedness within constitutional or statutory limitation of indebtedness of municipality or other political subdivision,* 146 A.L.R. 328, 344; 96 A.L.R. 1385, 1393; 72 A.L.R. 687, 697 and cases therein discussed. Here, however, we have, not the pledge of existing property, but only the use of cash for the construction of the proposed facility from the Authority's general funds. As in *Castle Farms,* no burden of taxation on future generations by the future sale of existing property is involved. "There is no prohibition in the Constitution against making appropriations to private institutions, provided the purpose is public, or semi-public, and thousands and thousands of dollars are appropriated out of the annual receipts every year." *Johns Hopkins Univ. v. Williams, supra,* 197 Md. at 401.

The present use of cash from current funds is essentially different from the pledge of valuable property the income from which, as in *Gill,* may have a direct bearing on the tax rate. Here, the situation is analogous to the appropriation of current funds of the State in the construction of access highways to bridges of the State Roads Commission. While it is true that

the highways, when built, remain the property of the State, they are valueless without the bridge to which they lead, as was the old market in *Castle Farms*. For example, without the construction of the Chesapeake Bay Bridge, the dual highway which was built with State money as access to the bridge would lead only to empty shore.

The pledge of the Center, when built, as security for the Authority's bonds will not jeopardize any property of the State which now exists. If there is default in the bonds and the Center is sold for the benefit of the bondholders, the State will lose nothing which it now has. The future burden on the taxpayers will be no greater than if the Center had never been built.

In the thorough annotation in 146 A.L.R. 328 (1943) it is stated:

> "Although there is some authority to the contrary, the majority view, that the acquisition of property by a municipality under an arrangement whereby the cost thereof is to be paid out of the revenue from the property itself does not give rise to a debt or liability of the municipality within the meaning of a constitutional or statutory limitation of indebtedness, although the property so acquired is encumbered by a mortgage or lien to secure the payment of the cost thereof, where the encumbrance does not attach to any other property of the municipality (see the annotation in 72 ALR 697), has been approved in a number of recent decisions." at 352-53.

2 Antieau, *Municipal Corporation Law* § 15.17 (1965) is to the same effect. See also 15 McQuillin, *Municipal Corporations* § 41.34 (3rd ed. 1950). In addition to the cases cited and analyzed in 146 A.L.R. and in the previous annotations on the subject, there are subsequent decisions in accord with the majority view. In *Opinion of Justices No. 108*, 252 Ala. 583, 42 So. 2d 348 (1949), Phoenix City proposed to finance the building of an amusement park by revenue bonds and to give as security a mortgage upon the park which would be subject to sale in event of default; the Justices pointed out that no existing property of the city would be pledged and advised that,

in their opinion, the pledge of the park, when built, did not create an obligation under the state constitution. *Loomis v. Keehn,* 400 Ill. 337, 80 N. E. 2d 368 (1948) held that a statute authorizing the State Armory Board to issue its revenue bonds for the building of armories and to pledge the property acquired or received as security did not create a debt against the state and was constitutional; the court said, "the pledge of the property partakes of the nature of the purchase-money mortgage." (400 Ill. at 341). In *State v. Rhodes,* 156 Ohio St. 81, 100 N. E. 2d 225 (1951), the City of Columbus had passed an ordinance for the issuance of mortgage revenue bonds for the acquisition and creation of off-street parking facilities, with a mortgage upon the properties and facilities, when acquired or built, as security; it was held the ordinance did not create an indebtedness within the constitutional limitation.

Some respected courts have held to the contrary, e.g., *Mc-Nichols v. City & County of Denver,* 123 Colo. 132, 230 P. 2d 591 (1950); *Brash v. State Tuberculosis Bd.,* 124 Fla. 167, 167 So. 827 (1936); and *Lesser v. Warren Borough,* 237 Pa. 501, 85 Atl. 839 (1912). These decisions are based on the conclusion that a debt is created when any municipal or state property is made subject to foreclosure proceedings even though the property was not owned at the time the bonds were issued. With deference, we believe this reasoning, if applied to the Maryland constitutional provision, takes too narrow a view of the purpose of the prohibition.

The distinction between the effect of pledging previously existing and valuable property of the political subdivision as security for the revenue bonds and the pledging only of property to be constructed or acquired out of the bonds' proceeds is illustrated by several Wisconsin cases. In *State v. Giessel,* 267 Wis. 331, 65 N. W. 2d 529 (1954) cited by the appellant, the State Building Commission was authorized to borrow money for the construction of a new state office building and to secure the loan by a mortgage on the existing state office building. Even though it was provided that no state debt was to be created, the Court held the pledge of the existing property would create a debt in violation of the constitutional prohibition. However, in *Meier v. City of Madison,* 257 Wis. 174,

42 N. W. 2d 914 (1950), it was held that hospital revenue bonds of a city to be secured by the pledge of the hospital which was to be built did not constitute an indebtedness of the city within the constitutional debt limitation. While a 1932 constitutional amendment provided that an indebtedness of a municipality created for the purpose of acquiring a public utility and secured solely by the property and income of the utility should not be included in arriving at the debt limitation if no municipal liability is created, the court held no indebtedness was created apart from the provisions of the constitutional amendment.

In *Burnham v. City of Milwaukee,* 98 Wis. 128, 73 N. W. 1018 (1897), decided long before the constitutional amendment, Milwaukee had contracted to purchase certain lands on an installment basis. A taxpayer sought to enjoin the city from issuing bonds to finance the construction of a garbage reduction plant on the ground that the city had already exceeded its constitutional limit of indebtedness. The court held that the land purchase contracts did not create a debt within the meaning of the constitutional limitation since the city was not obligated to pay the balance of the price of the land purchased. In arriving at this conclusion, the Wisconsin court considered our decision in *Gill,* saying:

> "We are cited to cases holding, in effect, that a borrowing of money upon a pledge of existing public property, or a charge upon the public revenue, constitutes a debt, within the meaning of such an inhibition as the one here involved, although no promise of payment is in terms made. *Baltimore v. Gill,* 31 Md. 375; *Newell v. People ex rel. Phelps,* 7 N. Y. 9-87. The reasoning on which these decisions rest is that it is a manifest evasion of the law, and that the lender has power to demand and collect the entire amount loaned out of the corporate property; that, while there may be no promise to pay by the corporation, there is a power to enforce *out of the corporate property* by reason of the pledge or hypothecation thereof. Thus it is construed to be a debt because the

payment of the amount due may be enforced out of the city funds or property. Such is not the case here." 98 Wis. at 133.

In a comprehensive analysis of the Wisconsin cases, there is the following comment on *Burnham* and decisions which follow it: "These cases * * * are based on the rationale that the municipality can walk away from the obligation none the poorer. From the point of view of assets and revenues available for expenditure it is in the same position after entering into these obligations as it was before." Kiernan, *Wisconsin Municipal Indebtedness,* 1964 Wis. L. Rev. 173, 208-09.

The import of our prior opinions on the purpose and interpretation of Section 34 of Article III of our Constitution, the analysis of the limited effect of the provisions of the Act and Resolution respecting the use of the Authority's current funds in the construction of the Center and its pledge of the Center as security for the bonds, and the weight of authority in other jurisdictions in which similar questions have been considered, lead us to conclude that the constitutional prohibition has not been violated.

### III

That the issuance of the revenue bonds by the Authority will not violate the constitutional provisions against giving or lending the credit of the State to or in aid of any individual, association or corporation, or involve the State in the construction of works of internal improvement, is clearly shown by *Bonsal v. Yellott, supra; Wyatt v. State Roads Comm'n, supra; Castle Farms Dairy Stores, Inc. v. Lexington Mkt. Authority, supra,* and *Johns Hopkins Univ. v. Williams, supra.* The holdings of these cases in respect of the meaning of the "credit" provision is discussed in Part I of this opinion. In each of them, the particular facility involved (a public road, a public bridge, a market and an educational institution) was held not to be a work of internal improvement, within the meaning of the constitutional prohibition. *Melvin v. Board of County Comm'rs of Anne Arundel County,* 199 Md. 402, 86 A. 2d 902 (1952) so holds as to a general hospital.

In *Bonsal,* Judge Boyd for the Court, said that the several

provisions of the Constitution "show conclusively that the 'works of internal improvement' intended were such as the State had been connected with or interested in as 'stockholder,' or 'creditor'—such as had driven it to the very verge of bankruptcy and repudiation—and not such as every State government must have, either in its own name or in the names of its 'political agencies, created for the better government of the affairs of the State,' * * *" 100 Md. at 505.

In *Courtesy Sandwich Shop v. Port of N. Y. Authority, supra,* it was held that the statute providing for the World Trade Center was enacted for a public purpose, even though portions of the Center were to be leased to private persons. *Rogers v. City of Mobile,* 277 Ala. 261, 169 So. 282 (1964) held valid a statute providing for the construction and operation of a wharf facility in Mobile for the refining and processing of sugar. The Alabama court determined, *inter alia,* that the proposed action of the city under which the State Docks Department would enter into service and employment agreements with private corporations from which they would presumably derive benefits did not constitute an unconstitutional lending of credit to the corporation by the city or the department.

The Act and the Resolution under which the Authority's revenue bonds are to be issued in no way violate Section 34 of Article III of the Maryland Constitution.

*Decree affirmed; costs to be paid by appellant.*

PRESCOTT, C. J., filed the following concurring opinion.

I fully concur in the able opinion of Judge Oppenheimer. Several times therein it refers to the *Frostburg* case. My only reason for filing this short opinion is to state that I still have the convictions set forth in my dissent filed in that case, but feel, under the doctrine of stare decisis, bound by the opinion of the majority therein. The same result would be reached herein, if *Frostburg* had never been decided.