[921 NE2d 164, 893 NYS2d 472]

In the Matter of DANIEL GOLDSTEIN et al., Appellants, v NEW YORK STATE URBAN DEVELOPMENT CORPORATION, Doing Business as EMPIRE STATE DEVELOPMENT CORPORATION, Respondent.

Argued October 14, 2009; decided November 24, 2009

512

## POINTS OF COUNSEL

*Emery Celli Brinckerhoff & Abady LLP,* New York City (*Matthew D. Brinckerhoff* and *Eric Hecker* of counsel), and *South Brooklyn Legal Services,* Brooklyn (*Jennifer Levy* and *John C. Gray, Jr.,* of counsel), for appellants. I. The seizure of appellants' homes and businesses violates the New York Constitution's Public Use Clause. (*Matter of New York El. R.R. Co.,* 70 NY 327; *Newell v People,* 7 NY 9; *People ex rel. Hackley v Kelly,* 24 NY 74; *People ex rel. Lewisohn v O'Brien,* 176 NY 253; *People v Rathbone,* 145 NY 434; *People ex rel. Garling v Van Allen,* 55 NY 31; *Matter of King v Cuomo,* 81 NY2d 247; *Settle v Van Evrea,* 49 NY 280; *Kelo v New London,* 545 US 469; *Browne v City of New York,* 213 App Div 206.) II. The project violates article XVIII, § 6 of the New York State Constitution. (*Matter of King v Cuomo,* 81 NY2d 247; *Settle v Van Evrea,* 49 NY 280; *Matter of Murray v LaGuardia,* 291 NY 320; *Kelo v New London,* 545 US 469.) III. Appellants are entitled to appeal to this Court

as of right because this case implicates substantial constitutional questions.

*Bryan Cave LLP,* New York City (*Philip E. Karmel, J. Kevin Healy, L. Margaret Barry* and *Ronald Joshua Bliss* of counsel), and *Berger & Webb, LLP* (*Charles S. Webb III* and *Kenneth J. Applebaum* of counsel), for respondent. I. This Court has no jurisdiction over this proceeding because petitioners have not raised a substantial constitutional question and it was not commenced within the 30-day deadline set by EDPL 207 and 208. (*Matter of East Thirteenth St. Community Assn. v New York State Urban Dev. Corp.,* 84 NY2d 287; *Matter of Anderson v New York State Urban Dev. Corp.,* 45 AD3d 583; *Brody v Village of Port Chester,* 345 F3d 103; *Biz-Biz Corp. v State of New York,* 29 AD3d 720; *Barlow v Sun Chem. Co.,* 15 Misc 3d 953; *Semtek Int'l Inc. v Lockheed Martin Corp.,* 531 US 497; *Kahn v Trans World Airlines,* 82 AD2d 696; *Hakala v Deutsche Bank AG,* 343 F3d 111; *Romano v Romano,* 19 NY2d 444; *Tanges v Heidelberg N. Am.,* 93 NY2d 48.) II. The exercise of eminent domain for the project does not violate the State Constitution. (*Matter of New York City Hous. Auth. v Muller,* 270 NY 333; *Yonkers Community Dev. Agency v Morris,* 37 NY2d 478; *Berman v Parker,* 348 US 26; *Matter of Murray v LaGuardia,* 291 NY 320; *Kelo v New London,* 545 US 469; *Matter of Aspen Cr. Estates, Ltd. v Town of Brookhaven,* 12 NY3d 735; *Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400; *Cannata v City of New York,* 11 NY2d 210; *People v Taylor,* 9 NY3d 129; *Payne v Tennessee,* 501 US 808.) III. Article XVIII, § 6 of the State Constitution applies only to state-subsidized low-rent housing projects and thus is inapplicable to Atlantic Yards. (*Hotel Dorset Co. v Trust for Cultural Resources of City of N.Y.,* 46 NY2d 358; *Ginsberg v Purcell,* 51 NY2d 272; *Association for Protection of Adirondacks v MacDonald,* 253 NY 234; *Matter of Murray v LaGuardia,* 291 NY 320; *Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400; *Tribeca Community Assn. v New York State Urban Dev. Corp.,* 200 AD2d 536; *Dorsey v Stuyvesant Town Corp.,* 299 NY 512; *Atlantic Cleaners & Dyers, Inc. v United States,* 286 US 427; *Kaskel v Impellitteri,* 306 NY 73; *Gart v Cole,* 166 F Supp 129, 263 F2d 244.)

*Goldstein, Goldstein, Rikon & Gottlieb, P.C.,* New York City (*Michael Rikon* of counsel), for Willets Point United, Inc., amicus curiae. I. This Court should hold that private property may not be taken except for a public use. (*Chicago, B. & Q. R. Co. v Chicago,* 166 US 226; *Kelo v New London,* 545 US 469; *Brown v*

*Legal Foundation of Wash.*, 538 US 216; *Hawaii Housing Authority v Midkiff*, 467 US 229; *Lynch v Household Finance Corp.*, 405 US 538.) II. New York's Constitution only allows eminent domain for a public use. (*Wright v United States*, 302 US 583; *Matter of New York City Hous. Auth. v Muller*, 270 NY 333; *Kaskel v Impellitteri*, 306 NY 73; *Courtesy Sandwich Shop v Port of N.Y. Auth.*, 12 NY2d 379; *Yonkers Community Dev. Agency v Morris*, 37 NY2d 478; *City of Yonkers v Otis El. Co.*, 844 F2d 42; *Greenwich Assoc. v Metropolitan Transp. Auth.*, 152 AD2d 216, *appeal dismissed sub nom. Matter of Regency-Lexington Partners v Metropolitan Transp. Auth.*, 75 NY2d 865; *Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400.)

*Institute for Justice*, Arlington, Virginia (*Jeff Rowes, Dana Berliner* and *Robert J. McNamara* of counsel), for Institute for Justice, amicus curiae. I. This Court should follow other states in rejecting complete deference in the context of eminent domain. (*Kelo v New London*, 545 US 469; *99 Cents Only Stores v Lancaster Redevelopment Agency*, 237 F Supp 2d 1123; *Taylor v Vermont Dept. of Educ.*, 313 F3d 768; *Matter of 49 WB, LLC v Village of Haverstraw*, 44 AD3d 226; *Yonkers Community Dev. Agency v Morris*, 37 NY2d 478.) II. Justice and fundamental fairness require this Court to apply meaningful scrutiny to the use of eminent domain. (*People v Weaver*, 12 NY3d 433; *Kelo v New London*, 545 US 469.)

*Michael A. Cardozo, Corporation Counsel*, New York City (*Paul T. Rephen, Rita D. Dumain* and *Rochelle H. Cohen* of counsel), for City of New York, amicus curiae. I. CPLR 205 (a)'s tolling provision does not apply to a proceeding brought pursuant to EDPL 207 (C). (*Yonkers Contr. Co. v Port Auth. Trans-Hudson Corp.*, 93 NY2d 375; *Romano v Romano*, 19 NY2d 444; *Matter of City of New York [Grand Lafayette Props. LLC]*, 6 NY3d 540; *Matter of C/S 12th Ave. LLC v City of New York*, 32 AD3d 1; *Matter of Village of Pelham v City of Mount Vernon*, 302 AD2d 397; *Carr v Yokohama Specie Bank, Ltd.*, 272 App Div 64, 297 NY 674; *Bernardez v Federal Deposit Ins. Corp.*, 104 AD2d 309, 64 NY2d 943; *Matter of East Thirteenth St. Community Assn. v New York State Urban Dev. Corp.*, 84 NY2d 287; *Matter of Anderson v New York State Urban Dev. Corp.*, 45 AD3d 583, 10 NY3d 710; *United States Fid. & Guar. Co. v Smith Co.*, 46 NY2d 498.) II. The Court should decline jurisdiction because this appeal does not present substantial constitutional questions. (*Board of Educ. of Monroe-Woodbury Cent. School Dist. v*

*Wieder,* 72 NY2d 174; *Matter of New York City Hous. Auth. v Muller,* 270 NY 333; *Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400; *Matter of West 41st St. Realty v New York State Urban Dev. Corp.,* 298 AD2d 1, 98 NY2d 727, 537 US 1191; *Matter of New York Pub. Interest Research Group v New York State Thruway Auth.,* 77 NY2d 86; *Murray v LaGuardia,* 291 NY 320; *Matter of Medical Socy. of State of N.Y. v State of N.Y. Dept. of Health,* 83 NY2d 447.) III. The Appellate Division properly found that the proposed acquisition does not violate the Public Use Clause of the New York Constitution and there is no basis to disturb Empire State Development Corporation's determination. (*Matter of New York City Hous. Auth. v Muller,* 270 NY 333; *Rosenthal & Rosenthal, Inc. v New York State Urban Dev. Corp.,* 771 F2d 44; *Kelo v New London,* 545 US 469; *Matter of Waldo's, Inc. v Village of Johnson City,* 74 NY2d 718; *Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400; *Matter of West 41st St. Realty v New York State Urban Dev. Corp.,* 298 AD2d 1; *Yonkers Community Dev. Agency v Morris,* 37 NY2d 478; *Berman v Parker,* 348 US 26; *Matter of Aspen Cr. Estates, Ltd. v Town of Brookhaven,* 12 NY3d 735; *Matter of 49 WB, LLC v Village of Haverstraw,* 44 AD3d 226.)

*L. Blake Morris Law Firm,* Brooklyn (*Kerry Fontana* of counsel), for Fifth Avenue Committee and another, amici curiae. I. The creation of affordable housing is and always has been a substantial justification for the Atlantic Yards redevelopment project. II. Enforcing the plain language of article XVIII, § 6 of the New York State Constitution will not produce absurd results, nor will it place unjustified burdens on the developer. (*Chelcy v Buffalo Mun. Hous. Auth.,* 24 Misc 2d 598; *Minkin v City of New York,* 24 Misc 2d 818, 10 AD2d 830; *Coalition for Responsible Planning v Koch,* 142 Misc 2d 1038; *Davidson v City of Elmira,* 180 Misc 1052, 267 App Div 797.) III. Respondent's proposed "affordable" housing is not really affordable for low-income persons. IV. Respondent's Modified General Project Plan issued on June 23, 2009 reveals that affordable housing may never be built at the site. V. The Atlantic Yards redevelopment project violates the New York State Constitution. (*People ex rel. Garling v Van Allen,* 55 NY 31; *Matter of King v Cuomo,* 81 NY2d 247; *Settle v Van Evrea,* 49 NY 280; *Bradley v Degnon Contr. Co.,* 224 NY 60; *Kelo v New London,* 545 US 469; *Matter of New York City Hous. Auth. v Muller,* 270 NY 333; *People v P.J. Video,* 68 NY2d 296; *Denihan Enters. v O'Dwyer,* 302 NY 451.)

**OPINION OF THE COURT**

Chief Judge LIPPMAN.

We are asked to determine whether respondent's exercise of its power of eminent domain to acquire petitioners' properties for purposes of the proposed land use improvement project, known as Atlantic Yards, would be in conformity with certain provisions of our State Constitution. We answer in the affirmative.

On December 8, 2006, respondent Empire State Development Corporation (ESDC) issued a determination pursuant to Eminent Domain Procedure Law (EDPL) § 204, finding that it should use its eminent domain power to take certain privately owned properties located in downtown Brooklyn for inclusion in a 22-acre mixed-use development proposed, and to be undertaken, by private developer Bruce Ratner and the real estate entities of which he is a principal, collectively known as the Forest City Ratner Companies (FCRC).

According to the record upon which the ESDC determination was based and by which we are bound (*see Matter of Levine v New York State Liq. Auth.*, 23 NY2d 863, 864 [1969]), the development will extend eastward from the junction of Atlantic and Flatbush Avenues, and include blocks now occupied by the subgrade Vanderbilt rail and MTA bus yards as well as certain blocks bordering the yards to the south. The project is to involve, in its first phase, construction of a sports arena to house the NBA Nets franchise, as well as various infrastructure improvements—most notably reconfiguration and modernization of the Vanderbilt Yards rail facilities and access upgrades to the subway transportation hub already present at the site. The project will also involve construction of a platform spanning the rail yards and connecting portions of the neighborhood now separated by the rail cut. Atop this platform are to be situated, in a second phase of construction, numerous high rise buildings and some eight acres of open, publicly accessible landscaped space. The 16 towers planned for the project will serve both commercial and residential purposes. They are slated to contain between 5,325 and 6,430 dwelling units, more than a third of which are to be affordable either for low and/or middle income families.

The project has been sponsored by respondent ESDC as a "land use improvement project" within the definition of the Urban Development Corporation Act ([Act] L 1968, ch 174,

sec 1, § 3 [6] [c] [McKinney's Uncons Laws of NY § 6253 (6) (c)]), upon findings that the area in which the project is to be situated is "substandard and insanitary" (see id.; and see also Act § 10 [c] [McKinney's Uncons Laws of NY § 6260 (c)]) or, in more common parlance, blighted. It is not disputed that the project designation and supporting blight findings are appropriate with respect to more than half the project footprint, which lies within what has, since 1968, been designated by the City of New York as the Atlantic Terminal Urban Renewal Area (ATURA). To the south of ATURA, however, and immediately adjacent to the Vanderbilt Yards cut, are two blocks and a fraction of a third which, although within the project footprint, have not previously been designated as blighted. FCRC has purchased many of the properties in this area, but there remain some that it has been unsuccessful in acquiring, whose transfer ESDC now seeks to compel in furtherance of the project, through condemnation. In support of its exercise of the condemnation power with respect to these properties, some of which are owned by petitioners, ESDC, based on studies conducted by a consulting firm retained by FCRC, has made findings that the blocks in which they are situated possess sufficient indicia of actual or impending blight to warrant their condemnation for clearance and redevelopment in accordance with a section 6253 (6) (c) land use improvement plan, and that the proposed land use improvement project will, by removing blight and creating in its place the above-described mixed-use development, serve a "public use, benefit or purpose" in accordance with the requirement of EDPL 204 (B) (1).

Petitioners' initial challenge to ESDC's determination authorizing condemnation of their properties was made in a timely federal court action. The gist of that action was that the disputed condemnation was not supported by a public use and thus violated the Fifth Amendment of the Federal Constitution. In the federal action, petitioners also asserted a pendant state claim, seeking review of the ESDC determination pursuant to EDPL 207. Petitioners' federal claims were rejected by the Federal District Court (Goldstein v Pataki, 488 F Supp 2d 254 [ED NY 2007]) and the District Court judgment dismissing the complaint was affirmed by the Second Circuit (516 F3d 50 [2008], cert denied 554 US —, 128 S Ct 2964 [2008]). With respect to the state law claim, however, the District Court merely declined to exercise its supplemental jurisdiction (488 F Supp 2d at 291) and, accordingly, its judgment, as affirmed by the

Second Circuit, dismissed that claim "without prejudice to its being re-filed in state court" (*id.*). Within six months, petitioners commenced the present proceeding in the Appellate Division, Second Department (*see* EDPL 207 [A]). The petition alleged two essential, still surviving[1] claims: that the proposed taking was not for a "public use" but for the benefit of a private party and thus would be in violation of article I, § 7 (a) of the New York State Constitution and EDPL 207 (C) (1); and that the condemnation proceeding was not in conformity with the State Constitution (*see* EDPL 207 [C] [1]) for the additional reason that the project it was to advance, although financed with state loans or subsidies, was not limited in occupancy to persons of low income in accordance with the requirement of article XVIII, § 6 of the New York Constitution. In its answer, respondent, while defending the challenged determination on the merits, sought the petition's dismissal on the ground that it had not been timely brought.

The Appellate Division, although rejecting respondent's contention that the proceeding was time-barred, found for respondent on the merits (64 AD3d 168 [2d Dept 2009]). It observed that, while the State Constitution, literally read and in its early construction, permitted the taking of property only for "public use," "public use" had since come to be understood as entailing no more than a dominant public purpose. The Court noted that it was well established that the eradication of blight was such a public purpose and found that ESDC's blight findings were supported by the area studies contained in the administrative record. As to the contention that the proposed project and, consequently, the condemnation proceeding in its behalf, were not in conformity with article XVIII, § 6, the Appellate Division held that that provision should be read to apply only to projects for the construction of low income housing and not to projects rehabilitating substandard land through improvement, such as Atlantic Yards.

The matter is now before us on petitioners' appeal as of right on constitutional grounds (CPLR 5601 [b] [1]). Petitioners would have us consider the above-described article I, § 7 and article XVIII, § 6 claims. Respondent, however, contends, as it did before the Appellate Division, that the petition should be dismissed without reaching the merits because it was not filed

---

1. The due process claim raised by petitioners in the Appellate Division has evidently been abandoned.

in the Appellate Division within 30 days after the completion of the publication of the challenged findings and determination (*see* EDPL 207 [A]).

## I

■ It is, of course, true that EDPL 207 (A) provides that a proceeding challenging an EDPL 204 condemnation determination must be filed in the appropriate Appellate Division within 30 days following the determination's completion and publication. It is, however, also true that the CPLR generally applies to EDPL proceedings (EDPL 703), and that CPLR 205 (a) effectively tolls the running of a statutory period to permit refiling within six months when an action has been timely commenced but dismissed on grounds other than voluntary discontinuance, lack of personal jurisdiction, neglect to prosecute, or the entry of a final judgment on the merits. It is plain— indeed, expressly so—that the federal dismissal of petitioners' state law claim was not upon any of these grounds and that the dismissal explicitly contemplated the refiling of the state law claim in state court.[2] It is also plain that the claim was, in fact, refiled in the Appellate Division within six months of the federal dismissal.

Respondent's contentions that petitioners should be deprived of the benefit of CPLR 205 (a) because the EDPL specifically displaces it (*see* EDPL 703, 705), or by reason of policy considerations favoring expedition in condemnation proceedings, are without merit. The EDPL does not, by prescribing a

---

2. Here, we note our disagreement with the contention championed by the concurrence that the federal complaint contained no distinct state law claim. The complaint contains a separate cause of action against ESDC alleging, in precise repetition of the ground for review set forth in EDPL 207 (C) (4), that "[n]o public use, benefit or purpose will be served by the property acquisition set forth in the Determination and Findings." Inasmuch as any EDPL 204 public use determination must be in conformity with both the Federal and State Constitutions (EDPL 207 [C] [1]), there is no tenable argument that the allegation was insufficient to raise and preserve an independent state claim. The state claim in the federal action, which would amount to an unexplained superfluity under the reading of the concurrence, was, of course, understood by both the District Court and the Second Circuit to express more than just a restatement of the federal claims also alleged. We see no reason to take a different view of the federal complaint. Certainly, the footnote cited by the concurrence from the Federal Magistrate's decision recommending *Burford* abstention (*Goldstein v Pataki*, 2007 WL 1695573, *1 n 5, 2007 US Dist LEXIS 44491, *5 n 5 [ED NY 2007])—a recommendation the District Court ultimately declined to follow (*Goldstein v Pataki*, 488 F Supp 2d 254 [2007])—is not persuasive in its characterization of the state claim's content.

special limitations period within which review of condemnation determinations must be sought, strip a litigant of the benefit of CPLR 205 (a). Indeed, it is the existence of a limitations period, whether of general or specific application, that is the raison d'être of CPLR 205 (a). The provision, founded upon the "sound premise" that a litigant "is entitled to have one adjudication of the substance or merit of his cause where he has initiated a suit in time" (*Carrick v Central Gen. Hosp.*, 51 NY2d 242, 252 [1980] [internal quotation marks and citations omitted]), shares with its venerable predecessor provisions the "broad and liberal purpose" of remedying what might otherwise be the harsh consequence of applying a limitations period where the defending party has had timely notice of the action (*Matter of Morris Invs. v Commissioner of Fin. of City of N.Y.*, 69 NY2d 933, 935 [1987], quoting *Gaines v City of New York*, 215 NY 533, 539 [1915]), and it has long been understood that that purpose "is not to be frittered away by any narrow construction" (*id.*).

Nor does the appeal to policy avail respondent. The review procedure set forth in EDPL 207 was doubtless intended to promote swift resolution of legal challenges to condemnation determinations. But all limitation periods proceed from policy considerations, among which is the particular desirability in certain kinds of cases of expeditious resolution. It cannot be argued from the existence of such policies, any more than it can from the existence of the limitations periods themselves, that litigants are to be denied the remedial benefit of CPLR 205 (a), which itself implements the "vitally important" policy preference for the determination of actions on the merits (*Hakala v Deutsche Bank AG*, 343 F3d 111, 115 [2d Cir 2003]; *see Carrick*, 51 NY2d at 252). We have declined to subordinate CPLR 205 (a) and the policy preference it embodies even where the effect of our declination was, as it is here, to toll for a substantial period a designedly brief limitations period (*see Matter of Morris Invs.*, 69 NY2d 933 [1987]).

In the final analysis, the only legal basis upon which CPLR 205 (a) might be deemed inapplicable is that the 30-day filing period prescribed in EDPL 207 (A) is to be understood not merely as a limitation upon the time within which a challenge to a condemnation determination may be brought, but as a condition of maintaining any such challenge, i.e., a substantive component of the claim rather than a limitation on the availability of a remedy (*see Yonkers Contr. Co. v Port Auth. Trans-Hudson Corp.*, 93 NY2d 375, 378 [1999]). But

such a construction of EDPL 207 (A)'s time limitation is not warranted, either textually or by reason of the provenance of the claim it governs. The statute does not by its terms condition the sufficiency of the claim upon compliance with the 30-day filing period (cf. Yonkers Contr. Co., 93 NY2d at 379), and the claim itself does not owe its existence to the EDPL, which is merely a procedural codification (see EDPL 101). The right to challenge a condemnation determination, and particularly to do so upon constitutional grounds, plainly predates and does not depend in substance upon the EDPL. To be contrasted are the claims at issue in the cases cited by respondent, in which the cause and the time limit attached to their commencement were the concurrent and substantively integrated consequence of a statutory enactment (see Romano v Romano, 19 NY2d 444, 447 [1967]; Tanges v Heidelberg N. Am., 93 NY2d 48, 55 [1999]).

While the concurrence protests that failure to bar this proceeding because it was not commenced within 30 days of subject condemnation determination will impair the Legislature's comprehensive plan for prompt adjudication of such determinations, this overlooks that it is not in the main the availability of CPLR 205 (a) that has delayed this condemnation, but the availability of a federal forum. Petitioners had every right to litigate their federal claims in federal court and to include in their federal action a supplemental state law cause of action (28 USC § 1367 [a]; Chicago v International College of Surgeons, 522 US 156, 169, 171 [1997]). And, even without a state tolling provision, petitioners would have had the right under federal law to recommence their unadjudicated pendant state law claim in state court at the federal action's conclusion (28 USC § 1367 [d]). However much they may have wished to streamline the process, it was not within the power of state legislators to deprive condemnees of access to federal court to litigate federal constitutional public use issues or to limit the federal courts' jurisdiction to adjudicate supplemental state law claims (see TBK Partners, Ltd. v Western Union Corp., 675 F2d 456, 460 n 3 [2d Cir 1982], citing Railway Co. v Whitton's Administrator, 13 Wall [80 US] 270, 286 [1872]; see also Marshall v Marshall, 547 US 293, 298-299, 313 [2006]). This being the case, it is practically beside the point to cavil about the frustration of the state legislative design.

The prospect of serial federal/state litigation in condemnation proceedings is, in any case, overstated by the concurrence. As respondent itself pointed out in its unsuccessful attempt to have

petitioners' federal action dismissed on abstention grounds, serial litigation of condemnation claims is exceedingly rare:

> "[I]n the thirty years since New York's Eminent Domain Procedure Law (the 'EDPL') was enacted in 1977, federal district courts sitting in New York have, in decisions published in the Federal Supplement or available through online sources, considered just *nineteen* suits challenging a condemnor's proposed exercise of eminent domain pursuant to New York law—only *five* of which included a claim under the Public Use Clause of the Fifth Amendment . . . By contrast, during that same thirty-year period, the various departments of the Appellate Division of the New York Supreme Court have, in reported decisions alone, adjudicated well over 100 proceedings brought pursuant to EDPL § 207—with many of those proceedings involving the consolidated petitions of multiple allegedly aggrieved parties" (mem of law, 2007 WL 539991).

There is no reason to suppose that serial condemnation litigation will now become the order of the day. Our decision to afford petitioners the benefit of CPLR 205 (a) does, and can do, nothing to affect the essential availability of the federal courts in litigation of this kind. There is every reason to suppose that resort to the federal courts to litigate state condemnation challenges will be as rare subsequent to our decision as it had been before. Nor is there reason to suppose that the status quo would be essentially altered by the procedural dismissal the concurrence urges.

## II

Turning now to the merits, petitioners first contend that the determination authorizing the condemnation of their properties for the Atlantic Yards project is unconstitutional because the condemnation is not for the purpose of putting their properties to "public use" within the meaning of article I, § 7 (a) of the State Constitution—which provides that "[p]rivate property shall not be taken for public use without just compensation"— but rather to enable a private commercial entity to use their properties for private economic gain with, perhaps, some incidental public benefit. The argument reduces to this: that the State Constitution has from its inception, in recognition of the fundamental right to privately own property, strictly limited

the availability of condemnation to situations in which the property to be condemned will actually be made available for public use, and that, with only limited exceptions prompted by emergent public necessity, the State Constitution's Takings Clause, unlike its federal counterpart, has been consistently understood literally to permit a taking of private property only for "public use," and not simply to accomplish a public purpose.

Even if this gloss on this State's takings laws and jurisprudence were correct—and it is not[3]—it is indisputable that the removal of urban blight is a proper, and, indeed, constitutionally sanctioned, predicate for the exercise of the power of eminent domain. It has been deemed a "public use" within the meaning of the State Constitution's Takings Clause at least since *Matter of New York City Hous. Auth. v Muller* (270 NY 333 [1936]) and is expressly recognized by the Constitution as a ground for condemnation. Article XVIII, § 1 of the State Constitution grants the Legislature the power to "provide in such manner, by such means and upon such terms and conditions as it may prescribe . . . for the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas," and section 2 of the same article provides "[f]or and in aid of such purposes, notwithstanding any provision in any other article of this constitution, . . . the legislature may . . . grant the power of eminent domain to any . . . public corporation . . . ." Pursuant to article XVIII, respondent ESDC has been vested with the condemnation power by the Legislature (Act §§ 10, 13 [McKinney's Uncons Laws of NY §§ 6260, 6263]) and has here sought to exercise the power for the constitutionally recognized public purpose or "use" of rehabilitating a blighted area.

Petitioners, of course, maintain that the blocks at issue are not, in fact, blighted and that the allegedly mild dilapidation and inutility of the property cannot support a finding that it is substandard and insanitary within the meaning of article XVIII. They are doubtless correct that the conditions cited in support of the blight finding at issue do not begin to approach in severity the dire circumstances of urban slum dwelling described by the *Muller* court in 1936, and which prompted the adoption of article XVIII at the State Constitutional Convention two years

---

**3.** By the time of *Matter of New York City Hous. Auth. v Muller* (270 NY 333 [1936]) it was evident that "[u]se of a proposed structure, facility or service by everybody and anybody is one of the abandoned universal tests of a public use" (*id*. at 342).

later (*see* 1938 Rep of NY Constitutional Convention Comm, vol 6, part 2, at 636-639). We, however, have never required that a finding of blight by a legislatively designated public benefit corporation be based upon conditions replicating those to which the Court and the Constitutional Convention responded in the midst of the Great Depression. To the contrary, in construing the reach of the terms "substandard and insanitary" as they are used in article XVIII—and were applied in the early 1950s to the Columbus Circle area upon which the New York Coliseum was proposed to be built—we observed:

> "Of course, none of the buildings are as noisome or dilapidated as those described in Dickens' novels or Thomas Burke's 'Limehouse' stories of the London slums of other days, but there is ample in this record to justify the determination of the city planning commission that a substantial part of the area is 'substandard and insanitary' by modern tests" (*Kaskel v Impellitteri*, 306 NY 73, 78 [1953], *cert denied* 347 US 934 [1954]).

And, subsequently, in *Yonkers Community Dev. Agency v Morris* (37 NY2d 478, 481-482 [1975]), in reviewing the evolution of the crucial terms' signification and permissible range of application, we noted:

> "Historically, urban renewal began as an effort to remove 'substandard and insanitary' conditions which threatened the health and welfare of the public, in other words 'slums' (*see* NY Const, art XVIII, § 1), whose eradication was in itself found to constitute a public purpose for which the condemnation powers of government might constitutionally be employed. Gradually, as the complexities of urban conditions became better understood, it has become . clear that the areas eligible for such renewal are not limited to 'slums' as that term was formerly applied, and that, among other things, economic underdevelopment and stagnation are also threats to the public sufficient to make their removal cognizable as a public purpose. (See *Cannata v City of New York*, 11 NY2d 210; *Matter of Murray v La Guardia*, 291 NY 320; *Kaskel v Impellitteri*, 306 NY 73, *supra*; *Levin v Township Committee of Twp. of Bridgewater*, 57 NJ 506; *Schenck v City of Pittsburgh*, 364 Pa 31; *Berman v Parker*, 348 US 26, 32;

and see, generally, Bosselman, Alternatives to Urban Sprawl: Legal Guidelines for Governmental Action, Research Report No. 15 to the National Commission on Urban Problems, Wash, DC, 1968, for the historical development of these concepts of urban renewal.)''

It is important to stress that lending precise content to these general terms has not been, and may not be, primarily a judicial exercise. Whether a matter should be the subject of a public undertaking—whether its pursuit will serve a public purpose or use—is ordinarily the province of the Legislature, not the Judiciary, and the actual specification of the uses identified by the Legislature as public has been largely left to quasi-legislative administrative agencies. It is only where there is no room for reasonable difference of opinion as to whether an area is blighted, that judges may substitute their views as to the adequacy with which the public purpose of blight removal has been made out for those of the legislatively designated agencies; where, as here, ''those bodies have made their finding, not corruptly or irrationally or baselessly, there is nothing for the courts to do about it, unless every act and decision of other departments of government is subject to revision by the courts'' (*Kaskel*, 306 NY at 78).

It is quite possible to differ with ESDC's findings that the blocks in question are affected by numerous conditions indicative of blight, but any such difference would not, on this record, in which the bases for the agency findings have been extensively documented photographically and otherwise on a lot-by-lot basis, amount to more than another reasonable view of the matter; such a difference could not, consonant with what we have recognized to be the structural limitations upon our review of what is essentially a legislative prerogative, furnish a ground to afford petitioners relief (*see id.* at 79-80; *see also Matter of Waldo's, Inc. v Village of Johnson City*, 74 NY2d 718, 720 [1989]; *Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 418 [1986]).

It may be that the bar has now been set too low—that what will now pass as ''blight,'' as that expression has come to be understood and used by political appointees to public corporations relying upon studies paid for by developers, should not be permitted to constitute a predicate for the invasion of property rights and the razing of homes and businesses. But any such limitation upon the sovereign power of eminent domain as it

has come to be defined in the urban renewal context is a matter for the Legislature, not the courts. Properly involved in redrawing the range of the sovereign prerogative would not be a simple return to the days when private property rights were viewed as virtually inviolable, even when they stood in the way of meeting compelling public needs, but a reweighing of public as against private interests and a reassessment of the need for and public utility of what may now be outmoded approaches to the revivification of the urban landscape. These are not tasks courts are suited to perform. They are appropriately situated in the policy-making branches of government.

The dissenter, after thoughtful review of the evolution of the concept of public use—an evolution that even he acknowledges has sapped the concept of much of its limiting power—urges that there remains enough left in it to require that this case be decided differently. We cannot agree. The Constitution accords government broad power to take and clear substandard and insanitary areas for redevelopment. In so doing, it commensurately deprives the Judiciary of grounds to interfere with the exercise. We have recognized this (*see Matter of Murray v LaGuardia*, 291 NY 320 [1943]; *Kaskel*, 306 NY 73 [1953]; *Yonkers Community Dev. Agency*, 37 NY2d 478 [1975]).

While there remains a hypothetical case in which we might intervene to prevent an urban redevelopment condemnation on public use grounds—where "the physical conditions of an area might be such that it would be irrational and baseless to call it substandard or insanitary" (*Kaskel*, 306 NY at 80)—this is not that case. The dissenter looks at the "blight study" contained in the administrative record and sees only a "normal and pleasant residential community" (dissenting op at 551), but others, it would appear not irrationally, have come to very different conclusions. This is not a record that affords the purchase necessary for judicial intrusion. The situation in the end is remarkably like that presented in *Kaskel* where Judge Desmond, writing for the Court, said:

> "Plaintiff does not dispute with defendants as to the condition of these properties or of the whole area. He is simply opposing his opinion and his judgment to that of public officials, on a matter which must necessarily be one of opinion or judgment, that is, as to whether a specified area is so substandard or insanitary, or both, as to justify clearance and

redevelopment under the law. It is not seriously contended by anyone that, for an area to be subject to those laws, every single building therein must be below civilized standards. The statute (and the Constitution), like other similar laws, contemplates that clearing and redevelopment will be of an entire area, not of a separate parcel, and, surely, such statutes would not be very useful if limited to areas where every single building is substandard. A glance at the photographs, attached to the city's affidavit on these motions, shows that a considerable number of buildings in this area are, on a mere external inspection, below modern standards because of their age, obsolescence and decay. The other exhibits confirm this" (*id.* at 79-80).

Here too, all that is at issue is a reasonable difference of opinion as to whether the area in question is in fact substandard and insanitary. This is not a sufficient predicate for us to supplant respondent's determination.

## III

Petitioners' remaining contention is that the proposed condemnation should not have been authorized because the land use improvement project it is to advance is not in conformity with article XVIII, § 6 of the State Constitution, which states:

"No loan, or subsidy shall be made by the state to aid any project unless such project is in conformity with a plan or undertaking for the clearance, replanning and reconstruction or rehabilitation of a substandard and unsanitary area or areas and for recreational and other facilities incidental or appurtenant thereto. The legislature may provide additional conditions to the making of such loans or subsidies consistent with the purposes of this article. *The occupancy of any such project shall be restricted to persons of low income as defined by law and preference shall be given to persons who live or shall have lived in such area or areas*" (emphasis added).

Petitioners understand this provision as requiring that any housing built as part of a land use improvement project receiving a state loan or subsidy be reserved for low income tenants. In alleging that Atlantic Yards, as presently configured, does not

comply with article XVIII, § 6, they point out that although it is a land use improvement project expressly governed by article XVIII (*see* Act § 3 [6] [c] [McKinney's Uncons Laws of NY § 6253 (6) (c)]) that has already received some $100 million in state financing and is expected to be the recipient of additional state aid earmarked for affordable housing, the majority of the project's housing units are slated to be rented or sold at market rates.

Petitioners' understanding of section 6 does not capture the provision's intendment. The principal objectives of article XVIII were to facilitate the clearance of slums and the construction of low rent housing (art XVIII, § 1). We have recognized that these objectives were not under the article necessarily, or even ordinarily, to be pursued in tandem—indeed, in *Matter of Murray* (291 NY at 331-332) we held that slums might, in accordance with the article, be replaced by non-low-rent housing. *Matter of Murray*, however, did not concern a project to which state funds had been committed (*id.* at 331; *and see Dorsey v Stuyvesant Town Corp.*, 299 NY 512, 521 [1949], *cert denied* 339 US 981 [1950]), and the issue petitioners would now have us determine is whether the commitment of such funds to a land use improvement project involving in its redevelopment phase the construction of housing necessarily effects a linkage of the article's otherwise independent purposes. We hold that it does not.

Article XVIII was, as noted, adopted and approved in the late 1930s to empower government, in partnership with private entities, to deal with the emergent problem of slums, which then spread over large portions of the urban landscape like running sores, endangering the health and well-being of their occupants and the civic life of the municipalities in which they were situated. What was envisioned was the use of the condemnation power to clear large swaths of slum dwellings—in some cases entire neighborhoods. The feasibility and ultimate purpose of this scenario, entailing the massive direct displacement of slum dwellers, required the creation of replacement low cost housing, and it is clear from the record of the 1938 Constitutional Convention that it was to address this need that the last sentence of article XVIII, § 6 was crafted[4] and, after extended separate consideration and revision, agreed upon (*see* 4 Rev

---

4. The author of the section, Mr. William Kuczwalski, in introducing it at the convention stated: "I say that we should remove the slum areas and upon those areas build new, decent homes for the people who cannot afford to live

Rec, 1938 NY Constitutional Convention, at 2998-3014). The sentence in essence assures that if housing is created in connection with a slum clearance project, and the project is aided by state loans or subsidies, the new housing will replace the low rent accommodations lost during the clearance. The framers' intent to provide for replacement of the housing units lost during slum clearance was made explicit at the Constitutional Convention when Mr. Joseph Clark Baldwin, one of the amendment's sponsors, explained "the purpose in [the amendment] is to tie up slum clearance and housing projects" (*id.* at 3001), and is particularly evident in the sentence's last clause, preferring as occupants for the new units those who "live or shall have lived" in the cleared area.

The situation before us is, as petitioners have elsewhere acknowledged and indeed urged, very different from the scenario addressed by the framers of section 6's occupancy restriction. The land use improvement plan at issue is not directed at the wholesale eradication of slums, but rather at alleviating relatively mild conditions of urban blight principally attributable to a large and, of course, uninhabited subgrade rail cut. The contemplated clearance will not cause direct displacement of large concentrations of low income individuals; only 146 persons lived within the project footprint at the time of the final environmental impact statement, and not all of those were persons of low income. It does not seem plausible that the constitutionality of a project of this sort was meant to turn upon whether its occupancy was restricted to persons of low income. While the creation of low income housing is a generally *worthy objective, it is not constitutionally required under article* XVIII, § 6 as an element of a land use improvement project that does not entail substantial slum clearance. To hold otherwise would in many cases arbitrarily tether land use improvement to *the creation of low rent housing and, in so doing, encumber, in* a manner plainly without the framers' contemplation, the exercise of one of article XVIII's "separate grants of power" (*Matter of Murray*, 291 NY at 329).

Accordingly, the order of the Appellate Division should be affirmed, with costs.

READ, J. (concurring). I reach the same result as the majority, but for a different reason: the 30-day time limit in Eminent

---

away or in better habitat. That is the purpose of this amendment" (4 Rev Rec, 1938 NY Constitutional Convention, at 2999).

Domain Procedure Law § 207 (A) is a condition precedent for judicial review of a condemnor's decision to acquire property by eminent domain. As a result, CPLR 205 (a) tolling plays no role in this case. And even if CPLR 205 (a) applied, it would not help petitioners because the Eminent Domain Procedure Law § 207 (C) (1) claim in their federal lawsuit was dismissed on the merits. In short, this lawsuit—which was commenced more than 18 months after the New York State Urban Development Corporation, doing business as Empire State Development Corporation (ESDC), published its determination and findings—is jurisdictionally deficient.

### Relevant Provisions of the EDPL

Section 207 of the Eminent Domain Procedure Law, entitled "Judicial review," establishes the way by which New York courts must review a condemnor's decision to acquire property by exercise of the power of eminent domain. Under section 207 (A), anyone seeking judicial review of a condemnor's findings and determination concerning a proposed public project

> "may seek judicial review thereof by the appellate division . . . in the judicial department embracing the county wherein the proposed facility is located by the filing of a petition in such court *within thirty days after the condemnor's completion of its publication of its determination and findings pursuant to section [204] herein*" (emphasis added).

In order to further expedite a final decision, section 207 (A) also calls for the prompt delivery of the transcript of the public hearing on the condemnation and the determination and findings to the court; specifies that the proceeding in the Appellate Division "shall be heard on the record without requirement of reproduction"; and mandates that if the proposed public project "is located in more than one judicial department [the] proceeding may be brought in any one, but only one of such departments and all such proceedings with relation to any single public project shall be consolidated with that first filed."

Section 207 (B) makes the Appellate Division's jurisdiction exclusive and its judgment and order final subject to our review "in the same manner and form and with the same effect as provided for appeals in a special proceeding." Further, "[a]ll such proceedings shall be heard and determined by the appellate division . . . and by the court of appeals, as expeditiously as possible and with lawful preference over other matters." (*Id.*)

Section 207 (C) states that "[t]he court shall either confirm or reject the condemnor's determination and findings," and limits the scope of review to four grounds: (1) whether the proceeding conformed with the Federal and State Constitutions (*see* EDPL 207 [C] [1]); (2) whether the condemnor's statutory jurisdiction or authority encompassed the proposed acquisition (*see* EDPL 207 [C] [2]); (3) whether the condemnor's procedures complied with the provision in article 2 of the Eminent Domain Procedure Law and article 8 of the Environmental Conservation Law (State Environmental Quality Review Act [SEQRA]) (*see* EDPL 207 [C] [3]); and (4) whether "a public use, benefit or purpose will be served by the proposed acquisition" (*see* EDPL 207 [C] [4]).

Next, section 208 of the Eminent Domain Procedure Law, entitled "Jurisdiction of courts," states that

> "[e]xcept as expressly set forth in [Eminent Domain Procedure Law § 207], and except for review by the court of appeals of an order or judgment of the appellate division . . . as provided for therein, *no court of this state shall have jurisdiction* to hear and determine any matter, case or controversy concerning any matter which was or could have been determined in a proceeding under this article" (emphasis added).

Finally, section 703, entitled "Application of CPLR," states that "[t]he civil practice law and rules shall apply to practice and procedure in proceedings under [the Eminent Domain Procedure Law] *except where other procedure is specifically provided by [the Eminent Domain Procedure Law]* or rules governing or adopted by the appropriate court" (emphasis added). Concomitantly, section 705, entitled "Applicability with respect to inconsistent laws," provides that "[n]otwithstanding any inconsistent provisions of law, general or special, the provisions of this law shall be controlling and . . . any interest in real property subject to acquisition shall be acquired pursuant to the provisions of this law."

Thus, section 207 forges a comprehensive regime for judicial review of a condemnor's decision to acquire property by eminent domain, each feature of which places a premium on speed: any challenge must be initiated in the Appellate Division, bypassing Supreme Court; only a limited number of carefully spelled out issues may be reviewed; the challenge must be brought within

30 days after the condemnor's determination and findings are published; the usual requirement for reproduction of the record is dispensed with; any subsequent, but still timely, challenge must be consolidated with the first-filed lawsuit so as to achieve a single, unified disposition; and these cases are to be handled as expeditiously as possible and afforded a preference. Section 208 drives home the exclusive nature of the section 207 regime by divesting the state courts of jurisdiction to decide matters encompassed within it in any other way. And then sections 703 and 705 insure that no provision of the CPLR may trump the section 207 regime: section 703 specifies that the CPLR does not apply "where other procedure is specifically provided by [the Eminent Domain Procedure Law]"—and the section 207 regime surely qualifies as "other procedure"—and section 705 states that "[n]otwithstanding any inconsistent provisions of law"—which would, of course, include any inconsistent provisions of the CPLR—"the provisions of [the Eminent Domain Procedure Law]"—which include the section 207 regime—"shall be controlling." In sum, section 207, especially when read in context with sections 208, 703 and 705, creates an exclusive and comprehensive program for judicial review of a condemnor's decision to acquire property by eminent domain, which is not susceptible to alteration by the CPLR. The Eminent Domain Procedure Law's legislative history reinforces what these provisions plainly say.

### Legislative History

Reform of New York's fragmented eminent domain laws was spurred in large part by concern for condemnees. In his memorandum supporting a commission to evaluate eminent domain laws and procedures, Governor Nelson A. Rockefeller noted the "delay, confusion and frustration" encountered by condemnees in resolving their claims for just compensation (Interim Rep of State Commn on Eminent Domain, Feb. 1, 1971, at 22).

In the first four months after its organization, the State Commission on Eminent Domain held public hearings. Based on these and other research, the Commission issued an interim report on February 1, 1971, which continued to focus on condemnees' needs as the reason for streamlining judicial oversight of takings using eminent domain (*see id.* at 8). In addition, the report introduced a proposal, which was provided by a participant at a public hearing, to have one court review all condemnation proceedings (*id.* at 27).

The Commission held further meetings, public hearings, and informal hearings with interest groups, and also analyzed eminent domain procedures then in practice and studied takings within New York. It discovered that litigation continued for approximately two years after the filing of the condemnor's map (an act that initiated vesting proceedings) (1971 Rep of State Commn on Eminent Domain, Feb. 1, 1972, at 85 [1971 Report]). The Commission also looked at how eminent domain worked in other countries, and noted that, in the Federal Republic of Germany, judicial review "must normally be sought by petition within one month after the decision" at issue was served on a petitioner (*id.* at 125). But different courts reviewed different challenges which "led to an often troublesome bifurcated system of judicial review" (*id.*). The Commission observed that "[t]o avoid resulting problems," Germany created a board of judges from different courts to review challenges to condemnation decisions (*id.* at 125-126).

In the 1971 Report, the Commission recognized that, as a general rule, the "existing eminent domain statutes in New York [did] not provide for an overall review of a project's beneficial and detrimental effects" (*id.* at 16). As desirable as such overall review might be, however, the Commission was also worried about the deleterious effects of prolonged litigation:

> "Nor should the construction of public projects be brought to a standstill, as the need for public projects in an advanced urban society is essential. In addition to the problem of a legal blockade of a project, is the fact that the resort to the courts for a review of a project's possible adverse effects results in a lengthy period of delay before ultimate deposition. The delay means that if a project is approved, construction costs will have greatly increased over the estimate, or if disapproved, alternative solutions must then be proposed, delaying the fulfillment of the need. During this delay the property owner often neglects his property, causing its decline in value and utility" (*id.*; *see also id.* at 25 ["It is a nationwide phenomenon that there is an increased use of the judicial process by opponents of various public projects. If this practice broadens and continues, it may very well result in the suspension of many public projects"]).

From this point, the Commission sought to formulate new rights

to judicial review of takings, but to do so in a such a way as to avoid burdening public projects with undue delay.

The Commission recommended that judicial review be limited to consideration of the condemnor's compliance with the statutory procedure. As a counterweight to limited judicial review, the Commission made two recommendations. First, the new statute should provide adequate process in which the condemning agency must review the project (*id.* at 25 ["It is felt that the procedure recommended by the Commission will create (adequate project review), and accordingly, the Commission recommends that only a limited right to seek court review be established. The basis of judicial scrutiny would be limited to ensure that the condemnor has complied with the procedural requirements, such as the extensive notice provisions. Review of the wisdom of the decision or basis therefor is not permitted"]). This review by the condemning agency would be followed by a second review undertaken by a new independent Board of Review. Second, public participation early on in a project's planning process should be increased (*id.* at 16-20 ["by removing the surprise element and entering into a partnership of planning, the natural resistance to a project may be lessened. If so, court contests of the decision to proceed with the project may be eliminated or cut down to a reasonable number" (*id.* at 20)]).

The Commission also made two recommendations regarding the hearing of a condemnee's claims. First, it proposed that the trial court be authorized "in its discretion, to order the trial of all claims arising from the same project to be tried in one proceeding" (*id.* at 37). This would, in part, "enable the court to hear all evidence relating to land value in a project in a relatively brief period of time. . . . [Hearing all evidence at once] will aid the court in reducing the trial time needed for each parcel" (*id.*). Second, the Commission proposed that appeals of both questions of fact and law be heard by the Appellate Division, while the Court of Appeals would hear appeals on matters of law only and by permission (*id.* at 38).

To accomplish these recommendations, the Commission provided study drafts of legislation (*id.* at 46-70). Within 30 days of the condemning agency's mailing of its determination and findings, a condemnee could seek the second review of the determination by the Board of Review (*id.* at 54). A condemnee could additionally seek judicial review of any action or determination under a proposed section 210, a predecessor to Eminent

Domain Procedure Law §§ 207 and 208. This section required the judicial procedure to

> "be in accordance with [CPLR] Article 78 . . . provided, however, that:

> "a) the time within which the proceeding under Article 78 must be commenced shall be thirty (30) days after the Board has mailed its decision.

> "b) judicial review shall be available only to require compliance with this Act or the constitution of the State of New York or the United States. Excepting, as provided in this section, no court shall have jurisdiction to review any proceeding, determination, finding, decision or action under this Article" (*id.* at 56).

The draft also contained a substantively similar predecessor to Eminent Domain Procedure Law § 703, which required application of the CPLR to proceedings except where the Eminent Domain Procedure Law provided other procedures. The Commission explained that this reference to the CPLR as a default mechanism was made "for purposes of uniformity" (State Commn on Eminent Domain, *Memorandum RE: The Commission's Proposed Eminent Domain Procedure Act*, Mar. 1973, at 33 [1973 Memorandum]).

In its next report, the Commission "continue[d] to endorse one tribunal to hear acquisition claims" (1972 Rep of State Commn on Eminent Domain, Mar. 1, 1973, at 7 [1972 Report]), but now recognized that this tribunal must be an existing court organization because "the magnitude of establishing this agency seemingly lies beyond the scope of the Commission" (1973 Memorandum at 12). Thus, this draft of proposed legislation eliminated the Board of Review. As a result, the Commission stated that the condemnor's decision "will be subject to judicial review in the form of an article 78 proceeding and not a separate administrative hearing" (*id.*).

In the 1973 draft, the Commission encouraged participation in public hearings by limiting judicial review to condemnees who "appear[ed] in a public hearing conducted by a condemnor" (1972 Report at 11; *see also* 1973 Memorandum at 13 ["Limiting standing to commence judicial review to those who appeared at the first opportunity, while also limiting the scope of review, should significantly reduce delay in final disposition"]). This draft also required challenges to be governed by CPLR article

78 and limited judicial review to four grounds, three of which are now contained in Eminent Domain Procedure Law § 207 (1972 Report at 12). The 30-day—or any other—limitation on filing was dropped from this version (*id.* at 11-12). In comments on these two sections, the Commission noted that "[l]itigation has delayed a final determination of whether the project should proceed. Limiting standing to commence judicial review to those who appeared at the first opportunity, and also limiting the scope of review, delay in final disposition may be reduced" (*see id.* at 12). In this draft, the predecessor of Eminent Domain Procedure Law § 703 was substantively the same as in current law. As the Commission commented, "[a]s much as has been practicable, the procedure in eminent domain matters has been coordinated with applicable provisions in the CPLR. The purpose is to obtain uniformity" (*id.* at 25).

In its final report, the Commission explained that instead of the Board of Review, it had "included within [the] proposed Act, only the condemnor's hearing which will be subject to the scrutiny of an expedited judicial review patterned after an article 78 proceeding" (1973 Rep of State Commn on Eminent Domain, Mar. 1, 1974, at 16). The draft Eminent Domain Procedure Act contained judicial review as now found in Eminent Domain Procedure Law § 207, in which the Appellate Division has exclusive jurisdiction and the scope of review is limited to specified issues (*id.* at 38-39). The 30-day limitation on challenges was reinstated (*id.*). The Commission's comments to this section repeated the statement in the 1971 Report that increasing litigation was a worrisome "nationwide phenomenon" (*id.* at 39), and stated that

"[i]t is felt that the procedure included in this article will create an expeditious review, and additionally, a limited right to seek court review is established . . .

"This section provides the exclusive remedy for judicial review of an Article 2 determination in an accelerated procedure patterned after the Public Service Law, Article VII, Sections 128 and 129 [governing siting of utility transmission facilities]" (*id.* at 39-40).

In comments to the section now found in Eminent Domain Procedure Law § 208, the Commission again emphasized that this procedure was to be the exclusive remedy:

"This section has been included to ensure that in a

proceeding under Article 2, the appellate review provided by section 20[7] shall be the exclusive remedy. The matters contained in the review shall be solely for the appellate division, and the proceeding must be instituted 30 days after the condemnor's publication and mailing of its determination and findings. It is the intent of sections 20[7] and 20[8] to achieve the procedural result attained in *Consolidated Edison Co. of New York, Inc. v. New York University*, 74 Misc 2d 923 (1973). There, the court in discussing Public Service Law, Art. VII, §§ 128, 129, held that subd. 1 of § 128 which provided that such proceeding for judicial review of an order of the Public Service Commission 'shall be brought in the appellate division of Supreme Court of the state in the judicial department embracing the county wherein the proposed facility is located,' clearly requires the judicial review proceeding to be brought in the appellate division" (*id.* at 40).

The draft bill was then approved by the Legislature. Additionally, out of concern that the requirements now found in Eminent Domain Procedure Law §§ 207 and 208 would permit judicial review of environmental effects, which it was feared would negatively affect the State's ability to provide for utilities, the Legislature then approved an act omitting those two sections from the bill (*see* Letter from Law Offices of Lexow and Jenkins, May 6, 1974, Veto Jacket, Veto 218 of 1974, at 185). Letters contained within the Veto Jacket reflect worry that this omission of present-day Eminent Domain Procedure Law §§ 207 and 208 would unintentionally subject condemnation decisions made pursuant to the Eminent Domain Procedure Law to judicial review under CPLR article 78. One letter, for example, written on behalf of utility companies, warned:

"Rather than making the hearings non-appealable, as was the apparent intent [of omitting the provisions now contained in Eminent Domain Procedure Law §§ 207 and 208], the net effect of deleting these two sections would appear to be to make appeals subject to Article 78 of the CPLR, since the CPLR is made applicable where no other procedure is specifically provided (Section 703). This creates broader grounds for review than existed in Sections 20[7] and 20[8] of the Act, and thus the effect is quite

> opposite the apparent intent." (Letter from Lexow and Jenkins, May 6, 1974, Veto Jacket, Veto 218 of 1974, at 185-186; *see also* Mem of Attorney General Louis J. Lefkowitz, May 31, 1974, Veto Jacket, Veto 218 of 1974, at 5; Mem of Power Auth of State of NY, Apr. 24, 1974, Veto Jacket, Veto 218 of 1974, at 167; Letter from Port Auth of NY and NJ, May 29, 1974, Veto Jacket, Veto 218 of 1974, at 207.)

Based on these considerations, Governor Malcolm Wilson vetoed both the Eminent Domain Procedure Law and the chapter amendments.

The following year, the bill was reintroduced with those sections now contained in Eminent Domain Procedure Law §§ 207 and 208 restored. Once again, letters to the Governor evidence that the CPLR was not intended to apply to the procedures established in sections 207 and 208. In comparing judicial review of proceedings exempt from the procedural requirements of Eminent Domain Procedure Law article 2, the Long Island Lighting Company stated, "[i]n such judicial review [of exempt proceedings], the entire range of CPLR remedies would be available to the condemnee . . . , unlike the situation following an Article 2 hearing, where review is limited" (Letter from Long Island Lighting Company, July 17, 1975, at 2, Veto Jacket, Veto 170 of 1975). Governor Hugh L. Carey vetoed the bill, citing numerous unrelated revisions needing to be made (*see* Governor's Veto Mem, Veto Jacket, Veto 170 of 1975). The Governor approved the bill upon its reintroduction in 1977.

In the years after the Eminent Domain Procedure Law went into effect, the Legislature considered potential alterations. An amendment threatening to lengthen judicial review was unsuccessful, while a measure to consolidate Eminent Domain Procedure Law and SEQRA review was adopted. First, in 1980 Governor Carey vetoed a bill that, in addition to making "minor technical changes," amended Eminent Domain Procedure Law § 208 by extending to lower courts jurisdiction for judicial review of public use (Governor's Veto Mem, Veto 56, 1980 NY Assembly Bill A1969, 1980 NY Legis Ann, at 436). The Governor noted that state agencies "strenuously object[ed]" to the extension of jurisdiction because "it will serve to substantially delay condemnation proceedings and will lengthen the judicial review process to a point where, in some cases, acquisition of property by the State may become impractical and prohibitively costly" (*id.*). A later amendment, sans the amendment to section 208,

instituted the technical changes to the Eminent Domain Procedure Law, and was approved (see Mem of NY Dept of Law, June 11, 1982, Bill Jacket, L 1982, ch 356, at 9).

In 1991, an amendment to Eminent Domain Procedure Law § 207 was approved, which expanded judicial review under the section to consider SEQRA compliance (see EDPL 207 [C] [3]). This amendment aimed to "streamline the procedure for judicial review of" a condemnor's decision by allowing consideration of both SEQRA and the Eminent Domain Procedure Law in a single proceeding (see Attorney General's Legislative Program Mem, Bill Jacket, L 1991, ch 356, at 5).

### Conditions Precedent and CPLR 205 (a)

To avert the consequences of their decision to forgo bringing this lawsuit in the Appellate Division within 30 days of ESDC's determination and findings, petitioners rely on CPLR 205 (a). CPLR 205 is entitled "Termination of action," and subdivision (a), designated "New action by plaintiff," provides as relevant that

> "[i]f an action is timely commenced and is terminated in any other manner than by a voluntary discontinuance, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits, the plaintiff . . . may commence a new action upon the same transaction or occurrence or series of transactions or occurrences within six months after the termination provided that the new action would have been timely commenced at the time of commencement of the prior action and that service upon defendant is effected within such six-month period."

Petitioners concede that the six-month toll in CPLR 205 (a) is unavailable to them, however, if the 30-day time limit in Eminent Domain Procedure Law § 207 (A) is a condition precedent to suit.

Our principal case discussing conditions precedent is Romano v Romano (19 NY2d 444 [1967]). There, the wife alleged that her consent to marriage was induced by the husband's fraudulent misrepresentations and that she left him upon discovery of the fraud, although she did not bring an action for annulment until 14 years later. The husband defaulted and never appeared in the action. The trial court nonetheless dismissed the

complaint on the ground that the three-year period fixed for the commencement of an action for annulment set out in Domestic Relations Law § 140 (e) was a part of the statutory cause of action itself.

We affirmed, reasoning that where a statute created a cause of action and attached a time limit to its enforcement, the time was an ingredient of the cause. As a result,

> "[t]his statutory provision could be seen as a sort of condition precedent, . . . probably more accurately described as . . . [a] special statutory limitation[ ] qualifying a given right in which time is made an essence of the right created and the limitation is an inherent part of the statute . . . out of which the right in question arises" (*id.* at 447 [internal quotation marks omitted]).

We subsequently held that CPLR 205 (a) does not extend a time limit that is a condition precedent to suit (*Yonkers Contr. Co. v Port Auth. Trans-Hudson Corp.*, 93 NY2d 375 [1999] [one-year time limit for suits against Port Authority in section 7107 of McKinney's Unconsolidated Laws of New York (L 1950, ch 301, § 7) is a condition precedent and therefore may not be extended by CPLR 205 (a)]).

The 30-day time limit in section 207 (A) is exactly the type of condition precedent described in *Romano*. When the Legislature adopted the Eminent Domain Procedure Law in 1977, it created a uniform procedure for pre-acquisition hearings before administrative agencies, which afforded potentially affected property owners new opportunities to have their objections or concerns aired and addressed before any taking occurred (*see* EDPL 201, 202, 203, 204). As a tradeoff for these newly created rights for condemnees—the exercise of which inevitably prolonged the acquisition timetable—the Legislature in section 207 (A) incorporated a 30-day time limit as one of several measures intended to simplify and speed up any subsequent judicial review of the condemnor's determination and findings. Thus, the 30-day time limit is a condition precedent not susceptible to tolling by CPLR 205 (a). Moreover, unlike the statutes involved in any other case where the question of whether a time limit is a condition precedent or a statute of limitations has arisen, the Legislature specifically preempted the CPLR where the Eminent Domain Procedure Law provides its own procedure, as it does in section 207 (A) (*see* EDPL 703, 705).

The majority argues, though, that the Legislature's intent when it enacted article 2 of the Eminent Domain Procedure Law is "practically beside the point" because petitioners would have had the right under federal law to bring their section 207 (C) (1) claim in state court by virtue of 28 USC § 1367 (d) (majority op at 522). Section 1367 (d) provides generally for the tolling of statutes of limitations with regard to state law claims during their pendency in federal court and "for a period of 30 days after [dismissal in federal court] unless State law provides for a longer tolling period."

Petitioners first mentioned 28 USC § 1367 (d) in their reply brief to us.[1] We generally do not opine on such newly raised issues because, without the benefit of briefing and oral argument from both parties, we are not fully informed. Further, considerations of fairness to the litigants come into play (see Misicki v Caradonna, 12 NY3d 511, 519 [2009]). I would also note that the United States Supreme Court has, to date, approached section 1367 (d) cautiously, particularly as it pertains to pendent claims asserted against state defendants (see Raygor v Regents of Univ. of Minn., 534 US 533, 549, 549 n 2 [2002, Ginsburg, J., concurring] [noting "the mist surrounding (section) 1367," and the "well-reasoned commentary" on the supplemental jurisdiction statute's flaws]).

In any event, even if 28 USC § 1367 (d) tolls an Eminent Domain Procedure Law § 207 (C) (1) claim asserted against ESDC,[2] these petitioners would not be helped (which may be why they never emphasized in this provision) because they did not commence this lawsuit within 30 days after the federal District Court dismissed their section 207 (C) (1) claim.[3] Petitioners waited until August 1, 2008 to refile their section

---

**1.** Petitioners' lawyer also alluded to an unspecified federal tolling provision in response to questioning during oral argument.

**2.** And as discussed later, this *particular* Eminent Domain Procedure Law § 207 (C) (1) claim was characterized by petitioners themselves as a "putative 'state law' claim" because, in fact, it asserted *no* claim under the State Constitution. This is certainly not the situation Congress would have envisaged when it adopted 28 USC § 1367 (d) to save pendent state claims dismissed by federal judges. Presumably, Congress intended to save state causes of action that asserted a state claim; not state causes of action that asserted only a federal claim.

**3.** In his commentary on supplemental jurisdiction, Professor Siegel advises that

"[t]he dismissal moment should be taken to be the moment of dismissal in the district court. Even if an appeal is taken to a court of appeals from the district court dismissal, the party whose

207 (C) (1) claim. This was 13 months—not 30 days—after the District Court dismissed this claim on June 6, 2007, and exactly six months after February 1, 2008, when the Second Circuit affirmed the District Court's judgment of dismissal.[4] And further assuming the availability of CPLR 205 (a) (that is, assuming that the 30-day limit in Eminent Domain Procedure Law § 207 [A] is a statute of limitations and therefore qualifies as a "longer tolling period" under state law within the meaning of 28 USC § 1367 [d]), the delay would be reduced from one year to seven months. Whether seven months or one year, these delays are significant, and they cannot be chalked up simply to the availability of a federal forum.

## The Federal Action and CPLR 205 (a)

In their federal court action, petitioners pleaded a claim under Eminent Domain Procedure Law § 207 (C) (1) to assert a violation of the Takings Clause of the Federal Constitution. The relevant claim stated that "[t]he Determination and Findings [of ESDC] do not conform, and result from proceedings that did not conform, with the United States Constitution" (amended complaint ¶ 176, quoted in *Goldstein v Pataki*, 488 F Supp 2d 254, 275 n 9 [ED NY 2007]). Defendants moved to dismiss this claim on various grounds, and the District Court referred the motion to a magistrate judge for a Report and Recommendation. The matter was briefed and orally argued before the magistrate judge, who noted that, although petitioners "assert a supplemental state law claim under New York Eminent Domain Procedure Law ('EDPL') § 207" (*Goldstein v Pataki*, 2007 WL 1695573, *1, 2007 US Dist LEXIS 44491, *5 [ED NY, Feb. 23, 2007]), "the Amended Complaint contains no claim under the state constitution" (*id.* n 5).

---

claim has been dismissed under § 1367 does best to commence the state action within the prescribed time measured from the district court dismissal, and not from some later appellate affirmance of it . . . This seems to be the safest course until there is a definitive federal ruling about whether the 30-day period may be measured from an appellate determination. The matter is not addressed by the statute" (Siegel, Commentary on 1988 Revision, 28 USCA § 1367, at 767).

4. Citing *Cohoes Hous. Auth. v Ippolito-Lutz, Inc.* (65 AD2d 666 [3d Dept 1978]), Professor Siegel observes that "[w]hile the [six-month] period supplied by CPLR 205 (a) will be measured from an appellate determination if the earlier action went through an appellate stage, this applies only where an appeal was available and was in fact taken" (Siegel, NY Prac § 52, at 75 [4th ed]).

Petitioners themselves emphasized this point in their objection to the Report and Recommendation, stating that "[t]o be sure, Plaintiffs have pled a supplemental claim under EDPL § 207. However, this putative 'state law' claim merely asserts that Defendants' use of eminent domain violates the *federal* Constitution because it will serve no public use. No underlying state claim is pled." The District Court accepted this argument, stating that

> "no state constitutional issue seems to be at play in this case. Plaintiffs' Section 207 (C) (1) claim is that '[t]he Determination and Findings do not conform, and result from proceedings that did not conform, with the United States Constitution.' That claim does not refer to the New York Constitution" (*Goldstein*, 488 F Supp 2d at 275 n 9 [citation omitted]).

On the merits, the District Court concluded that petitioners had "not sufficiently alleged that the takings at issue violate[d] the public use requirement" of the Takings Clause of the Federal Constitution (*id.* at 278), and so dismissed the case. Regarding petitioners' Eminent Domain Procedure Law § 207 claim, the court declined to exercise supplemental jurisdiction because it was dismissing all the claims over which it had original jurisdiction. The District Court then dismissed the section 207 claim "without prejudice to its being re-filed in state court" (*id.* at 291).[5] The United States Court of Appeals for the Second Circuit followed suit, and "affirm[ed] the judgment of the district court dismissing the federal claims with prejudice and the state claim without prejudice" (*Goldstein v Pataki*, 516 F3d 50, 65 [2d Cir 2008]). As noted previously, petitioners filed this lawsuit exactly six months after the Second Circuit's decision.

But because petitioners' section 207 (C) (1) claim, which asserted violation of the Takings Clause of the Federal Constitution only, was substantively identical to their 42 USC § 1983 claim for violation of the Takings Clause of the Federal Constitution, the District Court's dismissal of petitioners' section 1983 claim on the merits effectively resolved their section 207 (C) (1) claim on the merits as well. "While a dismissal with prejudice clearly constitutes an adjudication on the merits, a dismissal

---

5. Petitioners apparently asserted three claims within their Eminent Domain Procedure Law § 207 cause of action (their fourth cause of action): violations of sections 207 (C) (1), (3) and (4) (*Goldstein*, 488 F Supp 2d at 275). The District Court dismissed the section 207 cause of action in its entirety.

without prejudice only 'indicates,' as a general matter, that there has been no adjudication on the merits of the claim" (*ITT Corp. v Intelnet Intl.*, 366 F3d 205, 214 n 17 [3d Cir 2004]). And whether the federal courts' dismissal of petitioners' section 207 (C) (1) claim was "upon the merits" within the meaning of CPLR 205 (a) is a matter of state law for us to determine applying state precedents. We are not, as the majority suggests, somehow foreclosed from independently assessing this question by the federal courts' pro forma dismissal of petitioners' section 207 cause of action in its entirety (*see* n 5, *supra* at 544).

Further, petitioners' subsequent filing of this Eminent Domain Procedure Law § 207 (C) (1) claim does not "serve[ ] the salutary purpose" of CPLR 205 (a), which is to "prevent[ ] a Statute of Limitations from barring recovery where the action, at first timely commenced, had been dismissed due to a technical defect which can be remedied in a new action" (*United States Fid. & Guar. Co. v Smith Co.*, 46 NY2d 498, 505 [1979]; *see also Matter of Winston v Freshwater Wetlands Appeals Bd.*, 224 AD2d 160, 164 n 2 [2d Dept 1996] [stating that CPLR 205 (a) is "designed to prevent claims from being irreversibly extinguished following technical-type dismissals"]; *Hakala v Deutsche Bank AG*, 343 F3d 111, 115 [2d Cir 2003] ["The purpose of (section) 205 (a) is to avert unintended and capricious unfairness by providing that if the first complaint was timely but was dismissed for . . . curable reasons, the suit may be reinstituted within six months of the dismissal"]). Petitioners' section 207 (C) (1) claim was not dismissed by the District Court because of a "technical defect" or "curable reason." Rather, petitioners elected to assert a section 207 (C) (1) claim in their federal court action, and further chose to confine this claim to the same federal constitutional grounds that the federal court decided on the merits.

## Conclusion

What has happened in this case is precisely the result that the Legislature sought to prevent when it enacted the Eminent Domain Procedure Law—the sidelining of a public project on account of prolonged litigation. The language, structure and legislative history of the Eminent Domain Procedure Law show that the Legislature was aware of the risks presented by drawn-out or piecemeal judicial disposition of challenges to a taking, and sought at every turn to reduce these risks. Moreover, nothing in the language or the purpose animating CPLR 205 (a)

suggests that a condemnee who intends to dispute public use on federal and state constitutional grounds may take serial bites at the EDPL 207 (C) (1) apple—first in federal court, and then in state court.

The majority counters that "serial litigation of condemnation claims is exceedingly rare" and "[t]here is no reason to suppose that serial condemnation litigation will now become the order of the day" (majority op at 523). The historical observation is accurate; the prediction may turn out to be so much judicial whistling in the dark. After all, we have now opened up and exposed for all to see a whole new strategy for determined foes of a public project to exploit.

This petition should be dismissed because it was commenced more than 30 days after ESDC's determination and findings. The majority's unwillingness to enforce the 30-day time limit in Eminent Domain Procedure Law § 207 (A) impairs the Legislature's comprehensive plan for the promptest possible adjudication of a condemnor's article 2 determination and findings, and subjects future public projects to delay above and beyond any holdups caused by the availability of the federal forum.

SMITH, J. (dissenting). The good news from today's decision is that our Court has not followed the lead of the United States Supreme Court in rendering the "public use" restriction on the Eminent Domain Clause virtually meaningless. The bad news is that the majority is much too deferential to the self-serving determination by Empire State Development Corporation (ESDC) that petitioners live in a "blighted" area, and are accordingly subject to having their homes seized and turned over to a private developer. I do not think the record supports ESDC's determination, and I therefore dissent.

I

Article I, § 7 (a) of the State Constitution says: "Private property shall not be taken for public use without just compensation."

The words "public use" embody an important protection for property owners. They prevent the State from invoking its eminent domain power as a means of transferring property from one private owner to another who has found more favor with state officials, or who promises to use the land in a way more to the State's liking. They do not require that all takings result in public ownership of the property, but they do ordinarily

require that, if the land is transferred to private hands, it be used after the taking in a way that benefits the public directly. A recognized exception permits the transfer of "blighted" land to private developers without so strict a limitation on its subsequent use, but that exception is applicable only in cases in which the use of the land by its original owner creates a danger to public health and safety.

These principles are established by two centuries of New York cases. A line of nineteenth century decisions made clear that the State could not use the eminent domain power to transfer property from one private owner to another, unless the use to which the second owner put the property would be "public" in some meaningful sense. In the twentieth century—an era friendlier to government, and less friendly to private property— this rule was diluted, but our cases do not justify the conclusion that the public use limitation was abandoned or rendered trivial. Rather, the twentieth century cases created what may be called a "blight exception" to the public use limitation. The critical question on this appeal is whether that exception applies, a question that can be better understood after a more detailed description of the way our "public use" law has developed.

In the early nineteenth century, New York judges debated whether the eminent domain power could ever be used to transfer property from one private owner to another (*compare Bloodgood v Mohawk & Hudson R.R. Co.*, 18 Wend 9, 13-16 [1837, op of Chancellor Walworth], *with id.* at 56, 59, 60-61 [op of Senator Tracy]). Later cases make clear that this debate was settled in favor of the Chancellor's view that certain uses of property by private parties—e.g., for "turnpike and other roads, railways, canals, ferries and bridges" (*id.* at 13)—could be considered public, but that takings in which land was transferred to private hands would be strictly limited to situations in which the public nature of the use was clear (*see Taylor v Porter*, 4 Hill 140 [Sup Ct 1843] [taking of land for a private road held impermissible]; *Matter of Deansville Cemetery Assn.*, 66 NY 569 [1876] [taking for cemetery use held impermissible]; *Matter of Eureka Basin Warehouse & Mfg. Co. of Long Is.*, 96 NY 42, 48 [1884] [taking for docks, basins, piers and other structures held impermissible because "(t)he enterprise is, in substance, a private one, and the pretense that it is for a public purpose is merely colorable and illusory"]). In *Matter of Niagara Falls & Whirlpool Ry. Co.* (108 NY 375, 383 [1888]), we said: "The right

of the state to authorize the condemnation of private property for the construction of railroads and to delegate the power to take proceedings for that purpose to railroad corporations, has become an accepted doctrine of constitutional law and is not open to debate." But we held that the proposed taking in the *Niagara* case, which was for a railroad that would serve "the sole purpose of furnishing sight-seers during about four months of the year, greater facilities than they now enjoy for seeing . . . part of [the] Niagara river," was not for a public use (*id.* at 382).

Under the nineteenth century understanding of public use, the taking at issue in this case would certainly not be permitted. It might be possible to debate whether a sports stadium open to the public is a "public use" in the traditional sense, but the renting of commercial and residential space by a private developer clearly is not.

Our twentieth century cases, while not all consistent and containing some confusing language, are best read as modifying, rather than nullifying or abandoning, the established public use limitation. A series of cases upheld takings for what was variously characterized as slum clearance, removal of blight, or correction of unsafe, unsanitary or substandard housing conditions (*Matter of New York City Hous. Auth. v Muller*, 270 NY 333 [1936]; *Matter of Murray v LaGuardia*, 291 NY 320 [1943]; *Yonkers Community Dev. Agency v Morris*, 37 NY2d 478 [1975]). While these cases undoubtedly expanded the old understanding of public use, they did not establish the general proposition that property may be condemned and turned over to a private developer every time a state agency thinks that doing so would improve the neighborhood.

*Muller* approved a taking of property where "unsanitary and substandard housing conditions" were found to exist (270 NY at 337). We observed:

> "The public evils, social and economic of such conditions, are unquestioned and unquestionable. Slum areas are the breeding places of disease which take toll not only from denizens, but, by spread, from the inhabitants of the entire city and State. Juvenile delinquency, crime and immorality are there born, find protection and flourish. Enormous economic loss results directly from the necessary expenditure of public funds to maintain health and hospital ser-

vices for afflicted slum dwellers and to war against crime and immorality. Indirectly there is an equally heavy capital loss and a diminishing return in taxes because of the areas blighted by the existence of the slums" (*id.* at 339).

*Muller* did not involve transfer to an ordinary private developer: the property in question was to be rented by the City, or by "limited dividend corporations," to people of low income (270 NY at 342). In *Muller*, we reiterated the essential principle of the public use limitation:

"Nothing is better settled than that the property of one individual cannot, without his consent, be devoted to the private use of another, even when there is an incidental or colorable benefit to the public. The facts here present no such case . . . . [T]he public is seeking to take the defendant's property and to administer it as part of a project conceived and to be carried out in its own interest and for its own protection" (*id.* at 343).

*Murray*, unlike *Muller*, did involve a taking from which a purely private company "may ultimately reap a profit" (291 NY at 329). The need to remedy "conditions in those blighted urban areas where slums exist," conditions that "affect the health, safety and welfare of the public," furnished the reason for upholding the taking (*id.* at 326).

Our later decision in *Yonkers Community Development* is relied on heavily by ESDC here as permitting great leeway to the State in condemning blighted areas. But *Yonkers* contains language looking in both directions. It does seem to adopt a rather loose interpretation of "substandard" conditions that would justify a taking (*see* 37 NY2d at 483), but it also says that "courts are required to be more than rubber stamps in the determination of the existence of substandard conditions" (*id.* at 485) and that "in order to utilize the public purpose attached to clearance of substandard land, such clearance must be the primary purpose of the taking, not some other public purpose, however laudable it might be" (*id.* at 486). In *Yonkers*, we found that the agency had not provided factual support for its claim that the land to be taken was substandard (*id.* at 484-485), but held that the landowners had failed to raise this issue properly by their pleadings (*id.* at 486).

ESDC also relies on *Kaskel v Impellitteri* (306 NY 73 [1953]), which involved a very questionable "slum clearance" taking,

but overlooks an important aspect of that case. The challenge to the governmental action there was brought not by a condemnee, but by a taxpayer suing under General Municipal Law § 51, and we emphasized that in such a case the plaintiff must show corruption, fraud or "a total lack of power . . . under the law, to do the acts complained of" (306 NY at 79). We implied that the case might be different if the "arbitrary and capricious" standard of a CPLR article 78 proceeding were applicable (id.). Even on the stringent section 51 standard, Judges Van Voorhis and Fuld dissented and would have held plaintiff's claim sufficient to withstand summary judgment (id. at 82-91 [Van Voorhis, J., dissenting]).

The most troubling cases cited by ESDC are *Cannata v City of New York* (11 NY2d 210 [1962]) and *Courtesy Sandwich Shop v Port of N.Y. Auth.* (12 NY2d 379 [1963]), which can be read to support an interpretation of "public use" that would permit the transfer by eminent domain of almost anyone's property to a private entity if a state agency thinks the area would benefit from "redevelopment." These cases, however, must be understood in historical context. They were decided after the United States Supreme Court had adopted, in *Berman v Parker* (348 US 26, 33 [1954]), a "broad and inclusive" definition of public use, to include any "object . . . within the authority of Congress." *Berman*, as later cases confirmed, eviscerated the "public use" limitation of the United States Constitution (*see Hawaii Housing Authority v Midkiff*, 467 US 229 [1984]; *Kelo v New London*, 545 US 469 [2005]). And at the time of the *Cannata* and *Courtesy Sandwich Shop* decisions, our Court had not adopted the practice, which later became common (*see People v P.J. Video*, 68 NY2d 296, 303 [1986]), of interpreting our State Constitution to afford broader protection to individual rights and liberties than the Federal Constitution does. I would view *Cannata* and *Courtesy Sandwich Shop* as mistakenly following *Berman*'s lead, and would limit them to their facts or simply reject them, adopting instead the reasoning of Judge Van Voorhis's powerful dissents.

## II

The majority does not wholly reject what I have said in section I of this dissent. Indeed, the majority seems to accept the premise that the Eminent Domain Clause of the New York Constitution has independent vitality, and may offer more protection to property owners than its federal counterpart. I am

pleased that the majority does not follow the Supreme Court's decisions in *Berman*, *Midkiff* and *Kelo*, which equate "public use" in the Constitution with public purpose, thus leaving governments free to accomplish by eminent domain any goal within their general power to act. Where I part company with the majority is in its conclusion that we must defer to ESDC's determination that the properties at issue here fall within the blight exception to the public use limitation.

It is clear to me from the record that the elimination of blight, in the sense of substandard and unsanitary conditions that present a danger to public safety, was never the bona fide purpose of the development at issue in this case. Indeed, blight removal or slum clearance, which were much in vogue among the urban planners of several decades ago, have waned in popularity, vindicating the comment of Judge Van Voorhis, dissenting in *Cannata*, that "[t]he public theorists are not always correct" (11 NY2d at 218). It is more popular today to speak of an "urban landscape"—the words used by Bruce Ratner to describe his "vision" of the Atlantic Yards development in a public presentation in January 2004 (Powell, *For Brooklyn, a Celebration or a Curse?*, Washington Post, Jan. 26, 2004, at A3).

According to the petition in this case, when the project was originally announced in 2003 the public benefit claimed for it was economic development—job creation and the bringing of a professional basketball team to Brooklyn. Petitioners allege that nothing was said about "blight" by the sponsors of the project until 2005; ESDC has not identified any earlier use of the term. In 2005, ESDC retained a consultant to conduct a "blight study." In light of the special status accorded to blight in the New York law of eminent domain, the inference that it was a pretext, not the true motive for this development, seems compelling.

It is apparent from a review of ESDC's blight study that its authors faced a difficult problem. Only the northern part of the area on which Atlantic Yards is to be built can fairly be described as blighted. As the majority opinion explains, the northern part has long been included in the Atlantic Terminal Urban Renewal Area (ATURA), and is afflicted by deteriorating conditions perhaps attributable to the presence of the Vanderbilt Yards. But the southern part of the project area, where petitioners live, has never been part of ATURA and appears, from the photographs and the descriptions contained in ESDC's blight study, to be a normal and pleasant residential community.

ESDC's consultants did their best. Proceeding lot by lot through the area in which petitioners live, they were able to find that a number of buildings were not in good condition; petitioners claim that this results in large part from the fact that Ratner's plan to acquire the properties and demolish the buildings had been public knowledge for years when the blight study was conducted. Choosing their words carefully, the consultants concluded that the area of the proposed Atlantic Yards development, taken as a whole, was "characterized by blighted conditions." They did not find, and it does not appear they could find, that the area where petitioners live is a blighted area or slum of the kind that prompted twentieth century courts to relax the public use limitation on the eminent domain power.

The majority opinion acknowledges that the conditions ESDC relies on here "do not begin to approach in severity the dire circumstances of urban slum dwelling" contemplated by the cases that developed the blight exception (majority op at 524). The majority concludes, however, that determining whether the area in question is really blighted is not "primarily a judicial exercise" (id. at 526). In doing so, I think, the majority loses sight of the nature of the issue.

The determination of whether a proposed taking is truly for public use has always been a judicial exercise—as the cases cited in section I of this dissent, from *Bloodgood* in 1837 through *Yonkers Community Development* in 1975, demonstrate. The right not to have one's property taken for other than public use is a constitutional right like others. It is hard to imagine any court saying that a decision about whether an utterance is constitutionally protected speech, or whether a search was unreasonable, or whether a school district has been guilty of racial discrimination, is not primarily a judicial exercise. While no doubt some degree of deference is due to public agencies and to legislatures, to allow them to decide the facts on which constitutional rights depend is to render the constitutional protections impotent (*see e.g. NAACP v Claiborne Hardware Co.*, 458 US 886, 915 n 50 [1982]; *Ker v California*, 374 US 23, 34 [1963]).

The whole point of the public use limitation is to prevent takings even when a state agency deems them desirable. To let the agency itself determine when the public use requirement is satisfied is to make the agency a judge in its own cause. I think that it is we who should perform the role of judges, and that we should do so by deciding that the proposed taking in this case is not for public use.

Judges CIPARICK, GRAFFEO and JONES concur with Chief Judge LIPPMAN; Judge READ concurs in result in a separate opinion in which Judge PIGOTT concurs; Judge SMITH dissents in another opinion.

Order affirmed, with costs.